## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | | |
|---|---|---|
| James Regan, Jesse Faircloth,<br>Michael Pack, Thomas Haffey,<br>Jacob Stafford, and Kyle Watkins,<br>Each on Behalf of Himself and All Others<br>Similarly Situated, | )<br>)<br>)<br>)<br>) | |
| | ) | |
| Plaintiff, | ) | C.A. No.: 2:13-cv-3046-PMD |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| City of Charleston, South Carolina, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This matter is before the Court on Defendant City of Charleston, South Carolina's ("Defendant" or "the City") Motion for Partial Summary Judgment (ECF No. 126) ("Motion"). For the reasons set forth herein, the Court denies the City's Motion.

## BACKGROUND

Plaintiffs James Regan, Jesse Faircloth, Michael Pack, Thomas Haffey, Jacob Stafford, and Kyle Watkins ("Plaintiffs"), current or former employees of the City's Fire Department ("Department"), commenced this action on November 7, 2013, on behalf of themselves and others similarly situated, seeking unpaid overtime compensation pursuant to the collective action provision of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b). More specifically, the above-named Plaintiffs, as well as those who have subsequently given notice of their consent to join this action, are current or former firefighters[1] who were paid by the City pursuant to the fluctuating workweek ("FWW") method.

---

1. For purposes of this Order, the Court refers to all uniformed fire protection and suppression members and employees of the Department as firefighters, without regard to rank.

Plaintiffs' Complaint primarily alleges that the City's pay plan—in particular its incentive-pay ("IP") provision—failed to comply with the statutory and regulatory requirements pertaining to the FWW method. Plaintiffs' Complaint also asserts claims related to the method by which the City previously compensated firefighter recruit trainees. Moreover, Plaintiffs' Complaint alleges that certain named Plaintiffs, as well as others similarly situated, were not properly compensated for training hours that they contend constituted compensable time under the FLSA. Finally, Plaintiffs claim that the City's alleged violations of the FLSA were willful and knowing. Plaintiffs seek an award of unpaid overtime compensation, liquidated damages in an amount equal to the amount of unpaid overtime compensation, attorneys' fees, costs, and interest. In response to these allegations, the City admits that it utilized the FWW method but contends that its pay plan was lawful and in compliance with the FLSA and all applicable rules and regulations. Accordingly, the City has denied the asserted claims and any resulting liability.

On February 7, 2014, Plaintiffs moved for conditional certification of a proposed primary class and several subclasses. Following extensive briefing and a status conference, the Court issued an Order granting in part and denying in part Plaintiffs' Motion for Conditional Certification on July 16, 2014. Although the Court declined to conditionally certify Plaintiffs' proposed subclasses, the Court did conditionally certify the following primary class:

> All persons employed in a non-exempt capacity by the City of Charleston, South Carolina at any time from November 7, 2010 to the present who served, or trained to serve, as a uniformed suppression member of the City of Charleston Fire Department, and who were paid pursuant to the City's Fluctuating Workweek pay plan.

In conditionally certifying this matter as a collective action, the Court authorized Plaintiffs to provide putative class members with notice of the opportunity to opt-in to this lawsuit. To date, over 200 firefighters have joined this action.

2

On February 23, 2015, prior to the discovery deadline, the City filed the instant Motion, seeking the entry of partial summary judgment in its favor based on certain affirmative defenses.[2]  Plaintiffs filed a Response in Opposition to the City's Motion on March 16, 2015. The City filed a Reply on March 24, 2015, and Plaintiffs filed a Sur-Reply on April 8, 2015. Following additional discovery,[3] the City filed a Supplemental Memorandum of Law in support of the instant Motion on June 19, 2015, and Plaintiffs responded in like manner on June 30, 2015.  Accordingly, this matter is now ripe for consideration.[4]

## STANDARD OF REVIEW

To grant a motion for summary judgment, a court must find that "there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a).  The judge is not to weigh the evidence but rather must determine if there is a genuine issue for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  All evidence should be viewed in the light most favorable to the nonmoving party.  *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 124 (4th Cir. 1990).  "[I]t is ultimately the nonmovant's burden to persuade [the court] that there is indeed a dispute of material fact.  It must provide more than a scintilla of evidence—and not merely conclusory allegations or speculation—upon which a jury could properly find in its favor."  *CoreTel Va., LLC v. Verizon Va., LLC*, 752 F.3d 364, 370 (4th Cir. 2014) (citations omitted) (citing *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002)).  "[W]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by

---

2.   In its Motion, and more directly in the accompanying Motion to Stay, the City also requested a temporary stay of all discovery and other outstanding deadlines pending resolution of the instant Motion.  The Court denied the City's Motion to Stay on March 31, 2015.

3.   On May 14, 2015, the Parties filed a Joint Motion to Amend Scheduling Order.  Specifically, the Parties sought to reopen discovery and amend the remaining deadlines accordingly.  On May 15, 2015, the Court entered the Second Amended Scheduling Order.  Given the reopening of discovery, the Court allowed the Parties to supplement the record.

4.   More recently, the City filed a Motion for Summary Judgment addressing the merits of Plaintiffs' claims, as well as a Motion to Decertify or Narrow the Class.  Plaintiffs, for their part, have also filed a Motion for Summary Judgment on the merits.

summary judgment is appropriate." *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 119 (4th Cir. 1991). Summary judgment is not "a disfavored procedural shortcut," but an important mechanism for weeding out "claims and defenses [that] have no factual basis." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

## DISCUSSION

By way of the instant Motion and accompanying Memorandum in Support, the City requests that the Court grant partial summary judgment in its favor "based solely on affirmative defenses ple[aded] pursuant to 29 U.S.C. §§ 259 and 260 and the applicable limitations period." (Def.'s Mot. for Partial Summ. J. 1.) Although Plaintiffs have not identified any material facts in dispute,[5] they vehemently oppose the present Motion. The Court will address the City's arguments *seriatim*; however, before doing so, both a thorough explanation of the FWW method and a more detailed examination of the City's pay plan are required.

## I.      The FLSA and the FWW Method

### A.  The FLSA

The FLSA "is a remedial statute designed to 'eliminate . . . substandard labor conditions' in the United States." *Gaxiola v. Williams Seafood of Arapahoe, Inc.*, 776 F. Supp. 2d 117, 124 (E.D.N.C. 2011) (quoting *Powell v. U.S. Cartridge Co.*, 339 U.S. 497, 510 (1950)). "The FLSA is best understood as the 'minimum wage/maximum hour law.'" *Trejo v. Ryman Hosp. Props., Inc.*, No. 14-1485, 2015 WL 4548259, at *2 (4th Cir. July 29, 2015) (quoting *Monahan v. Cty. of Chesterfield*, 95 F.3d 1263, 1266 (4th Cir. 1996)). "In enacting the FLSA, Congress intended 'to protect all covered workers from substandard wages and oppressive working hours.'" *Id.*

---

5. Because Plaintiffs do not dispute the City's recitation of the facts, the relevant undisputed facts are set forth below as they correspond to the Court's analysis. *See* Local Civ. Rule 7.05(A)(4) (D.S.C.) ("A memorandum shall contain . . . [w]here [it] opposes a motion for summary judgment, a concise statement of the material facts in dispute with reference to the location in the record.").

(quoting *Barrentine v. Ark.–Best Freight Sys., Inc.*, 450 U.S. 728, 739 (1981)). Consequently, the FLSA's substantive sections "narrowly focus[] on minimum wage rates and maximum working hours," *id.* (quoting *Monahan*, 95 F.3d at 1267), requiring the payment of a minimum wage and providing specific limits on the maximum hours an employee may work without receiving the requisite overtime compensation, *see id.* (citing 29 U.S.C. §§ 206(a), 207(a)). Following the Supreme Court's decision in *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528 (1985), these requirements also apply to state governments and their municipal subdivisions. *See West v. Anne Arundel Cty.*, 137 F.3d 752, 760 (4th Cir. 1998) (citing *Garcia*, 469 U.S. 528); *Monahan*, 95 F.3d at 1267 (same).

The FLSA "generally requires employers to compensate employees at the overtime rate for all work performed over 40 hours per week." *Roy v. Cty. of Lexington*, 141 F.3d 533, 538 (4th Cir. 1998); *see also Flood v. New Hanover Cty.*, 125 F.3d 249, 251 (4th Cir. 1997) ("As a general rule, the FLSA provides that an employer may not employ an employee for a workweek longer than forty hours unless it pays its employee one and one-half times the employee's 'regular rate' for all hours in excess of forty."). The general rule is that an employer must pay employees overtime using the "time-and-a-half method" for work performed in excess of forty hours per week. 29 U.S.C. § 207(a)(1) ("[N]o employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."). However, Section 7(k) of the FLSA "provides a partial exemption for those public agencies employing persons 'engaged in fire protection or law enforcement activities,' by increasing the number of hours such employees must work above the regular 40-hour workweek before they are entitled to overtime

compensation." *Roy*, 141 F.3d at 537; *see also Monahan*, 95 F.3d at 1267 ("Recognizing the unique nature of the work performed by police officers and firefighters, Congress provided a partial exemption to the FLSA's overtime requirements for public agency employers." (citing 29 U.S.C. § 207(k))).   As to the former category, "a public employer need not compensate firefighters at the overtime rate until they have worked an aggregate of 212 hours for a period of 28 consecutive days (53 hours per week)." *Roy*, 141 F.3d at 538.  Accordingly, pursuant to 29 U.S.C. § 207(k) and the schedule outlined in the applicable implementing regulation, a public employer's duty to compensate firefighters at the requisite overtime rate is not triggered until the employee has worked fifty-three hours in a given workweek.  *See id.* at 538–39; *see also* 29 C.F.R. § 553.230(a), (c) (providing that for employees engaged in fire protection activities who have a fourteen-day work period, "overtime compensation (in premium pay or compensatory time) is required for all hours worked in excess of [106]").

Although the FLSA provides different methods by which employers may calculate compensation to ensure that they pay their employees in a manner that complies with the FLSA's minimum wage and overtime provisions, covered employees are entitled to receive overtime compensation whether they are paid on an hourly basis or are paid a salary.  *See* 29 C.F.R. §§ 778.110, 778.113.  As noted above, the FLSA generally requires overtime compensation "at a rate not less than one and one-half times the *regular rate* at which he is employed."  29 U.S.C. § 207(a)(1) (emphasis added).  Thus, the "keystone" of § 207(a)(1) is the "regular rate."  *Walling v. Youngerman-Reynolds Hardwood Co.*, 325 U.S. 419, 424 (1945).  "On that depends the amount of overtime payments which are necessary to effectuate the statutory purposes.  The proper determination of that rate is therefore of prime importance."  *Id.*

Under the FLSA, an employee's regular rate is calculated as an hourly rate. 29 C.F.R. § 778.109; *see also Urnikis-Negro v. Am. Family Prop. Servs.*, 616 F.3d 665, 673 (7th Cir. 2010) ("For purposes of the overtime calculation, an employee's regular rate of pay is the amount of compensation he receives per hour." (citing 29 C.F.R. § 778.109)). However, the fact that the regular rate is expressed as an hourly rate does not mean that employers must pay their employees by the hour to comply with the FLSA's mandates; "employees may, in practice, be paid in a variety of other ways." *Urnikis-Negro*, 616 F.3d at 673. Thus, the method of calculating an employee's regular rate depends on the manner in which the employee is compensated.

Logically, this regular rate determination is quite simple for employees paid strictly on an hourly basis—the regular rate is the employee's hourly rate or wage. *See* 29 C.F.R. § 778.110. "If the employer employs an employee on a weekly salary basis, it determines the employee's regular hourly rate of pay by dividing the weekly salary by the number of hours that it intends the weekly salary to compensate." *Flood*, 125 F.3d at 251; *see* 29 C.F.R. § 778.113. "Calculating overtime pay becomes more complicated, however, when an employee is paid a fixed weekly salary for hours that fluctuate each week." *Wills v. RadioShack Corp.*, 981 F. Supp. 2d 245, 254 (S.D.N.Y. 2013). "For such employees, employers are permitted to use the FWW method to comply with the FLSA's overtime requirement." *Id.*; *see* 29 C.F.R. § 778.114.

**B. *The FWW Method***

For reasons detailed herein, it is necessary to provide a brief history of the FWW method. The FWW method is derived from the Supreme Court's decision in *Overnight Motor Transportation Co. v. Missel*, 316 U.S. 572 (1942), decided four years after the passage of the FLSA. *See generally Cash v. Conn Appliances, Inc.*, 2 F. Supp. 2d 884, 893 & n.16 (E.D. Tex.

1997) (outlining, in greater detail, the origins of the FWW method).  In *Missel*, the Court addressed how to calculate overtime compensation under 29 U.S.C. § 216(b) for employees who are paid a fixed weekly salary for all hours worked but who work irregular, fluctuating, or variable hours.  *See Desmond v. PNGI Charles Town Gaming, L.L.C.*, 630 F.3d 351, 354 (4th Cir. 2011) (discussing *Missel*).  The Court concluded that for such employees, employers could calculate the employee's regular rate under the FLSA by dividing the employee's fixed weekly salary by the actual number of hours worked during that workweek.  *See Misssel*, 316 U.S. at 580 ("No problem is presented in assimilating the computation of overtime for employees under contract for a fixed weekly wage for regular contract hours which are the actual hours worked, to similar computations for employees on hourly rates.  Where the employment contract is for a weekly wage with variable or fluctuating hours the same method of computation produces the regular rate for each week." (footnote omitted)); *see also Wills*, 981 F. Supp. 2d at 254 ("The Court held that employers could, under the FLSA, calculate an employee's regular rate by dividing a fixed weekly salary by fluctuating hours, and then use that rate as the basis for calculating overtime pay.").

       In outlining what is now known as the FWW method, the Court noted that because the FLSA requires that an employee's remuneration "be reduced by some method of computation to hourly rates," *Missel*, 316 U.S. at 579, where an employee's hours fluctuate from week to week, the employee's regular rate will also vary each week, *id.* at 580.  Nevertheless, the Court explained that because "that rate is on an hourly basis, it is regular in the statutory sense inasmuch as the rate per hour does not vary for the entire week, though week by week the regular rate varies with the number of hours worked."  *Id.*  Although recognizing that using this method necessarily meant that "the longer the [employee's] hours the less the rate and the pay per hour,"

the Court stated that "[t]his is not an argument . . . against this method of determining the regular rate of employment for the week in question." *Id.* "[T]he lasting significance of the [*Missel*] decision is its approval under the FLSA of paying an employee a flat weekly salary for fluctuating hours so long as a premium is also paid of at least 'fifty per cent additional for the hours actually worked over the statutory maximum.'" *Wills*, 981 F. Supp. 2d at 254 (quoting *Missel*, 316 U.S. at 581).

In 1968, the United States Department of Labor ("DOL") promulgated an interpretative rule, titled "[f]ixed salary for fluctuating hours," 29 C.F.R. § 778.114, "which clarified how and when employers could use the 'half-time' method discussed in *Missel* to calculate overtime pay," *Wills*, 981 F. Supp. 2d at 255; *see also Snodgrass v. Bob Evans Farms, LLC*, No. 2:12-CV-768, 2015 WL 1246640, at *8 (S.D. Ohio Mar. 18, 2015) (describing § 778.114 as "an interpretive rule intended to codify the Supreme Court's decision in *Missel*"). The rule defines the FWW method and "sets forth a complicated mathematical formula for calculating overtime pay due under the FLSA."[6] *Duprey v. Scotts Co. LLC*, 30 F. Supp. 3d 404, 409 (D. Md. 2014). "The

---

6. Section 778.114 provides, in relevant part, as follows:

> An employee employed on a salary basis may have hours of work which fluctuate from week to week and the salary may be paid him pursuant to an understanding with his employer that he will receive such fixed amount as straight time pay for whatever hours he is called upon to work in a workweek, whether few or many. Where there is a clear mutual understanding of the parties that the fixed salary is compensation (apart from overtime premiums) for the hours worked each workweek, whatever their number, rather than for working 40 hours or some other fixed weekly work period, such a salary arrangement is permitted by the Act if the amount of the salary is sufficient to provide compensation to the employee at a rate not less than the applicable minimum wage rate for every hour worked in those workweeks in which the number of hours he works is greatest, and if he receives extra compensation, in addition to such salary, for all overtime hours worked at a rate not less than one-half his regular rate of pay. Since the salary in such a situation is intended to compensate the employee at straight time rates for whatever hours are worked in the workweek, the regular rate of the employee will vary from week to week and is determined by dividing the number of hours worked in the workweek into the amount of the salary to obtain the applicable hourly rate for the week. Payment for overtime hours at one-half such rate in addition to the salary satisfies the overtime pay requirement because such hours have already been compensated at the straight time regular rate, under the salary arrangement.

29 C.F.R. § 778.114(a).

FWW half-time calculation under *Missel* does not differ from the FWW half-time calculation under § 778.114. Both . . . use the exact same formula." *Snodgrass*, 2015 WL 1246640, at *7.

As set forth in § 778.114, the FWW method authorizes an employer to pay an employee a preset, predetermined weekly salary "as straight time pay for whatever hours he is called upon to work in a workweek, whether few or many," provided both that the fixed salary is sufficient to compensate the employee for hours worked "at a rate not less than the applicable minimum wage" and that the employer pays the employee overtime compensation "at a rate not less than one-half of his regular rate of pay." 29 C.F.R. § 778.114(a). Section 778.114 expressly states that the employee's regular rate "will vary from week to week and is determined by dividing the number of hours worked in the workweek into the amount of the salary to obtain the applicable hourly rate for the week." *Id.* According to the rule, paying the employee half or 50% of the regular rate for all hours worked in excess of the applicable statutory maximum, as opposed to 150% under the time-and-a-half method, "satisfies the overtime pay requirement because such hours have already been compensated at the straight time regular rate, under the salary arrangement." *Id.*; *see Flood*, 125 F.3d at 252 ("Since the employer has already paid the employee a regular rate of pay for all of the hours that the employee worked, including the overtime hours, it only has to pay an additional one-half time pay premium for the overtime hours." (citing 29 C.F.R. § 778.114(a); *Monahan*, 95 F.3d at 1280–81)). "In other words, because the fixed salary compensates the employee for all the hours worked that week—whether more or less than [the statutory maximum]—paying an additional 50% of the 'regular rate' for every hour above [the statutory maximum] complies with the FLSA's requirement that employers pay time-and-a-half for overtime hours." *Wills*, 981 F. Supp. 2d at 255.

Although this amounts to a departure from the standard time-and-a-half overtime premium, the Fourth Circuit has made clear that the FWW method is not an "exception" to the FLSA; instead, it merely represents "an alternative way for employers to calculate the regular rate of pay for certain salaried employees." *Flood*, 125 F.3d at 251. While the FWW method is not a pure statutory construct, it is nevertheless "a recognized method of compensation under the FLSA." *Griffin v. Wake Cty.*, 142 F.3d 712, 714 (4th Cir. 1998). The FWW method offers benefits for both employees and employers. As to the former, "[t]he plan allows employees the advantages of a base salary irrespective of the hours worked along with some overtime pay for hours in excess of forty per week." *Id.* Likewise, "[t]he system enables the employer to place workers on a variable schedule tailored to the nature of their work without incurring prohibitive overtime costs for weeks in which the hours are the longest." *Id.*

On July 28, 2008, the DOL issued a notice of proposed rulemaking and request for comments regarding "proposed revisions" to regulations issued under the FLSA and the Portal–to–Portal Act of 1947, 29 U.S.C. §§ 251 *et seq.* ("2008 Notice"). Updating Regulations Issued Under the Fair Labor Standards Act, 73 Fed. Reg. 43654-01 (proposed July 28, 2008). Although the 2008 Notice detailed a number of proposed modifications or revisions to the FLSA's implementing regulations, only the proposed revision to § 778.114 is relevant here. In this regard, the DOL announced that "the regulations governing the [FWW] method of computing half-time overtime pay for salaried nonexempt employees who work variable or fluctuating hours from week to week are in need of clarification and updating to delete outmoded examples and eliminate confusion over the effect of paying bonus supplements and premium payments to affected employees." *Id.* at 43655–56.

In addition to providing the text of this proposed amendment to § 778.114,[7] the 2008 Notice also included an enlightening three-paragraph discussion of the DOL's proposal. The DOL began its discussion by summarizing the requirements of the "current regulation" and again noting that "[t]he proposed rule would . . . clarify the [DOL's] regulation at [§ 778.114] addressing the [FWW] method of computing overtime compensation for salaried nonexempt employees." *Id.* at 43662. After discussing the "current regulation," the 2008 Notice observed that "[t]he payment of additional bonus supplements and premium payments to employees compensated under the [FWW] method has presented challenges to both employers and the courts in applying the current regulations." *Id.* Accordingly, in view of these "challenges," the DOL offered the "proposed regulation," which "provide[d] that bona fide bonus or premium payments do not invalidate the [FWW] method of compensation, but that such payments (as well as 'overtime premiums') must be included in the calculation of the regular rate unless they are excluded by FLSA sections 7(e)(1)–(8)." *Id.*; *see also Wills*, 981 F. Supp. 2d at 250 (explaining that the proposed amendment of § 778.114 "would have stated that an employer's payment of bonuses to an employee did not prevent the employer from using the FWW method to calculate the employee's overtime"). Lastly, as justification for the proposed revision, the DOL asserted that its proposal was consistent with *Missel*, explained that "[p]aying employees bonus or premium payments for certain activities such as working undesirable hours is a common and beneficial practice for employees," and predicted that its "proposed clarification would eliminate

---

7.   The 2008 Notice proposed adding the following sentence to the end of 29 C.F.R. § 778.114(a): "Payment of overtime premiums and other bonus and non-overtime premium payments will not invalidate the [FWW] method of overtime payment, but such payments must be included in the calculation of the regular rate unless excluded under section 7(e)(1) through (8) of the [FLSA]." 73 Fed. Reg. at 43670. Additionally, to explain the proposed revision to subsection (a), the DOL proposed amending § 778.114(b) to include an example "to illustrate these principles where an employer pays an employee a nightshift differential in addition to a fixed salary." *Id.* at 43662; *see id.* at 43670.

any disincentive for employers to pay additional bona fide bonus or premium payments." 73 Fed. Reg. at 43662.

On April 5, 2011, after receiving comments in response to the 2008 Notice, the DOL issued its final rule ("2011 Final Rule"), which took effect on May 5, 2011.  Updating Regulations Issued Under the Fair Labor Standards Act, 76 Fed. Reg. 18832-01 (Apr. 5, 2011). Although the 2011 Final Rule contained a number of new regulations, the DOL announced that after considering the comments submitted in response to the 2008 Notice, it had decided against implementing the proposed revisions to § 778.114 and would leave the substantive text unchanged.[8]  *See Snodgrass*, 2015 WL 1246640, at *11 (summarizing how the DOL "backtracked").  In explaining its decision not to adopt the proposed revisions outlined in the 2008 Notice, the DOL stated that "[w]hile the Department continues to believe that the payment of bonus and premium payments can be beneficial for employees in many other contexts, we have concluded that unless such payments are overtime premiums, they are incompatible with the fluctuating workweek method of computing overtime under section 778.114." 76 Fed. Reg. at 18850.  Further explaining its departure from the proposal set out in the 2008 Notice, the DOL noted that the previously proposed rule "would have been inconsistent with the requirement of a fixed salary payment set forth by the Supreme Court in [*Missel*]." *Id.*  Additionally, the DOL stated that, after "closer examination," it "is persuaded that the courts have not been unduly challenged in applying the current regulation to additional bonus and premium payments." *Id.* Accordingly, the DOL decided to "restore the current rule," having concluded that it would not be appropriate "to expand the use of [the FWW] method of computing overtime pay beyond the

---

8.   The 2011 Final Rule did make several non-substantive "[e]ditiorial revisions" to § 778.114, such as deleting gender-specific references and updating the examples to include wages above the minimum wage.  76 Fed. Reg. at 18850.

scope of the current regulation." *Id.*; *see also Wills*, 981 F. Supp. 2d at 250 (summarizing the 2011 Final Rule).

## II.     The City's Pay Plan

In 1996, the City was sued by some of its firefighters alleging improper use of the sleep-time provisions of 29 C.F.R. Part 553 ("Prior Lawsuit").  In 1998, as a part of and in conjunction with the settlement of the Prior Lawsuit, the City adopted a new pay plan using the FWW method ("1998 Pay Plan") as set forth in 29 C.F.R. § 778.114.  The 1998 Pay Plan provided, in relevant part, as follows:

> B.     Each employee shall be paid bi-weekly.
> . . . .
>      2.     Salaried employees will be paid an amount, bi-weekly, equivalent to the annual salary divided by 26 (regular pay).  Regular pay shall be paid, per pay period, regardless of the number of hours, or increments thereof, worked during the applicable pay period.  No deductions from regular pay shall be made for part day or part tour of duty absences.
>
> C.     Employees eligible for overtime compensation pursuant to the [FLSA] and applicable [DOL] Regulations shall be paid overtime as follows:
> . . . .
>      2.     Salaried employees will be paid overtime for each hour, or increment thereof, in excess of 106 per bi-weekly pay period.  This overtime premium shall be calculated by dividing the regular pay by the number of hours, or increments thereof, worked in the pay period, and by multiplying this figure by .5.  In bi-weekly pay periods where overtime is due, the employee shall receive his regular pay, plus the overtime premium calculated in accordance with the previously described formula and in accordance with 29 C.F.R. Sec. 778.114.

(Def.'s Mot. for Partial Summ. J., Ex. C, Settlement Agreement, Ex. B., Personnel Policy 1–2, ECF No. 126-4, at 8–9.)  The City continued to utilize the 1998 Pay Plan until January 2008, when the City altered its compensation plan for reasons outlined herein.

On June 18, 2007, the City, its citizens, and the Department suffered an unspeakable loss when nine firefighters lost their lives in a structure fire.  In the wake of this tragedy, the City's mayor, Joseph P. Riley, Jr., commissioned a panel to review various Department practices and

policies and to offer suggestions regarding possible ways to improve the Department's operations.  The resulting report proposed, *inter alia*, increasing the number of shifts, the number of firefighters on certain shifts, or both; however, in order to implement such policies, the Department needed to significantly expand its workforce.  Yet, the Department had just lost nine of its firefighters to the fire, as well as a number of others due to injuries and resulting issues such as post-traumatic stress disorder.  Given the delay associated with recruiting and training entry-level employees, the policy changes necessarily meant that existing firefighters would be required to work an unanticipated number of extra shifts in the interim.

According to the City, filling new shifts with current employees "was further complicated by the fact that the operation of a[n FWW] plan results in a diminishing overtime premium with increased number of hours."  (Def.'s Mem. in Supp. Mot. for Partial Summ. J. 4.)  Therefore, to incentivize firefighters to assume the additional workload, the City added the IP provision to its 1998 Pay Plan.  In a December 11, 2007 memorandum to then-Chief Rusty Thomas, Mayor Riley summarized the IP provision as follows:

> The [D]epartment will now offer a special incentive pay for any fire protection employee who works *extra unscheduled* shifts.  This incentive program will offer additional incentive pay that is over and above what our pay plan would otherwise require.  To participate in this incentive pay program during any particular work period, an employee must have actually worked all of his regularly scheduled shifts in that particular two-week work period.  In other words, an employee cannot participate in the incentive program in work periods in which he takes annual leave, sick or other leave.  The incentive pay for an extra unscheduled shift will be:
> | | |
> |---|---|
> | Captain: | $340.00 |
> | Engineer: | $310.00 |
> | Assistant Engineer: | $290.00 |
> | Fire Fighter: | $270.00 |
>
> In addition to the flat rate incentive fee outlined above, the employee will also receive the "half time" overtime that our current pay plan would ordinarily pay for overtime hours.  The incentive pay will also have the effect of increasing the rate paid for *all* overtime (even regularly scheduled overtime) that the

employee works in that particular work period because it will be added to the base salary for purposes of overtime calculations.

Although this is not a conventional "time-and-a-half" overtime program, the net result is that the affected employee will receive, *on average*, an amount comparable to what he would have received under a time-and-a-half plan.

(Def.'s Mot. for Partial Summ. J., Ex. A, ECF No. 126-2, at 3–4.)  Additionally, Mayor Riley noted that while the IP provision "is considered temporary, there is no current 'end' date set as of yet."  (*Id.* at 4.)  To further explain the change, Mayor Riley attached an exhibit containing a number of examples designed to illustrate how the IP program would work.

On December 12, 2007, Chief Thomas sent a memorandum to "All Fire Protection Shift Employees" addressing the issue of the increased need for unscheduled overtime.   In his memorandum, Chief Thomas explained that the demand for unscheduled overtime should decrease as additional firefighters are hired and trained but that "[i]n the interim, the City has announced an incentive program which will provide additional compensation to those fire department employees who step in to fill these overtime needs."  (*Id.* at 2.)  Chief Thomas also attached a copy of Mayor Riley's memorandum to his own, highlighting the accompanying examples and explaining that "[a]lthough we do not have a conventional 'time-and-a-half pay program, the incentive pay plan works in tandem with our current pay plan to provide pay that, on average, is comparable to time and a half."  (*Id.*)

Shortly after the City introduced and implemented the IP provision, the City's human resources director, Kay Cross ("Cross") became aware of the DOL's 2008 Notice.  Cross states in her affidavit that "[t]he information in the publication confirmed for me that our prior understanding of [§] 778.114 was correct according to the DOL, and the City continued to rely on that confirmation/interpretation until the DOL reversed itself in April 2011." (Cross. Aff. ¶ 1,

Def.'s Mot. for Partial Summ. J., Ex. D, ECF No. 126-5, at 2.)  The City did not make any changes to the IP provision at that time.

On May 4, 2011, after learning of the DOL's 2011 Final Rule, Cross sent a memorandum to Mayor Riley "outlin[ing] certain modifications to the CFD non-exempt pay plan which are necessary to comply with recent changes in federal law."  (Def.'s Mot. for Partial Summ. J., Ex. E, ECF No. 126-6, at 3.)  In her memorandum, Cross explained the circumstances that led to the "modifications":

> On April 11, 2011, the [DOL] amended its regulations relating to the [FWW] pay method.  Under these new regulations and the Agency comments accompanying them, employers utilizing the method are strictly prohibited from paying any additional pay on top of the fixed base salary to employees ***other than overtime pay***.  Although the law does not require than an employer using the method pay more than a half time overtime premium, that is a minimum, and there is no prohibition on paying a greater overtime premium.  Fortunately, the City's IP program is limited to paying only when overtime is actually worked, so that additional pay program can stay intact with only one minor modification as discussed below.  However, there are some relatively minor aspects of the pay plan which must undergo certain changes as are explained below.  The new DOL rules become effective on May 5, 2011, so all of the changes set forth below will be implemented during the first pay period beginning thereafter, which begins on May 14, 2011.

(*Id.* at 4 (footnote omitted).)  In a footnote, Cross discussed the DOL's 2008 Notice:

> The proposed version of these amended regulations came out in 2008.  Ironically, the initial proposed regulations "clarified" that employers were not prohibited from paying additional straight time pay so long as the base salary was never reduced.  As it happened, the DOL reversed itself and announced in the final regulations that additional pay for regular hours is now prohibited.

(*Id.* at n.1.)  With regard to the actual impact of the 2011 Final Rule on the City's use of the IP provision, Cross stated as follows:

> As discussed above, the change in DOL position will have very little effect on the City's IP program because that program has always been available only as an overtime premium pay.  CFD employees who worked "extra" shifts, but did not work all of their regularly scheduled hours were not eligible for and did not receive any additional pay because they did not work overtime.  The

amended regulations confirm that the half time overtime provision is a minimum only—additional overtime premiums are permitted by law and will continue to be. As a single exception, the City will modify how it calculates the IP flat rate on the first IP shift worked during an employee's short work period. Rather than simply pay a full flat IP fee for that shift, the flat fee will be prorated so that it directly corresponds with the number of overtime hours actually worked in that two-week period. In other words, if the employee has worked no other additional hours that period other than his normal 96, the first ten hours of the extra shift are, technically non-overtime hours. In contrast, the remaining 14 hours are actual overtime hours. Thus, going forward, an employee in that situation would be paid a prorated flat fee based on the actual number of overtime hours worked. This change will make the calculation of IP more uniform (since that is how it is currently calculated in a long work period) and will protect the legal integrity of our pay plan.

(*Id.* at 5–6.)  Then-Chief Thomas Carr subsequently emailed a copy of Cross's memorandum to all firefighters.  The changes to the IP provision outlined by Cross took effect on May 14, 2011.

The City contends that once it implemented the modifications outlined in the May 4, 2011 memorandum, its FWW-based pay plan and IP provision "remained unchanged until its cessation on February 28, 2014."  (Def.'s Mem. in Supp. Mot. for Partial Summ. J. 7.)  On February 28, 2014, the City transitioned to an hourly pay plan that utilizes the standard time-and-a-half method of calculating overtime compensation.  According to the City, its implementation of an hourly pay plan was unrelated to the filing of this lawsuit.

## III.    Analysis

The Portal–to–Portal Act includes certain affirmative defenses for employers that may apply even if the employer is found to be in violation of the FLSA.  *Martinez-Hernandez v. Butterball, LLC*, No. 5:07-CV-174-H 2, 2011 WL 4591073, at *2 (E.D.N.C. Sept. 30, 2011); *Gaxiola*, 776 F. Supp. 2d at 127; *De Luna-Guerrero v. N.C. Grower's Ass'n., Inc.*, 370 F. Supp. 2d 386, 390 (E.D.N.C. 2005).  The City relies on two such defenses in its Motion.  The first of these, and the primary focus of the City's Motion, is codified at 29 U.S.C. § 259(a) and "shields employers from liability under the FLSA if the employer pleads and proves that it acted in good

faith reliance upon a written administrative regulation, order, ruling, approval, or interpretation, of the [DOL], or an administrative practice or enforcement policy of DOL." *Martinez-Hernandez*, 2011 WL 4591073, at *2. In the alternative, the City asserts a second defense, codified at 29 U.S.C. § 260, that "gives the court discretion to limit or deny liquidated damages where the employer is found to have acted in good faith and had reasonable grounds to believe his act or omission did not violate the FLSA." *Id.* at *3. Additionally, the City requests summary judgment on the issue of the applicable statute of limitations, asserting that Plaintiffs have failed to demonstrate that any violations of the FLSA were willful as required to maintain the three-year limitations period. Having carefully considered the Parties' arguments, the Court finds that, based on this limited record, the City has not carried its heavy burden of demonstrating that it is entitled to the § 259(a) defense. As to the City's alternative arguments regarding liquidated damages and the three-year statute of limitations, the Court concludes that resolution of these issues at this time would be premature with the City's liability still an open question.

### A. Section 259(a)

The City first seeks to rely on the defense set forth in Section 10 of the Portal–to–Portal Act, codified as amended at 29 U.S.C. § 259(a). As stated by the Fourth Circuit:

> Under § 259, an employer is excused from failure to comply with the requirements of the [FLSA] "if he pleads and proves that the act or omission complained of was in good faith in conformity with and in reliance on any written administrative regulation, order, ruling, approval, or interpretation, of the [Wage and Hour Division of the Department of Labor], or any administrative practice or enforcement policy of such agency with respect to the class of employers to which he belonged."

*Dole v. Odd Fellows Home Endowment Bd.*, 912 F.2d 689, 695–96 (4th Cir. 1990) (alteration in original) (quoting 29 U.S.C. § 259(a)). Accordingly, "[t]o avail itself of this defense, an employer must prove (1) that it actually relied upon an administrative regulation, order, ruling,

approval, interpretation, enforcement policy or practice of the [DOL]; (2) that it acted in conformity with the regulation, order, ruling, approval, interpretation, enforcement policy or practice; and (3) that it acted in good faith in doing so." *Martinez-Hernandez*, 2011 WL 4591073, at *3; *see also Henchy v. City of Absecon*, 148 F. Supp. 2d 435, 442 (D.N.J. 2001) ("To assert a good faith defense under these sections, an employer bears the burden of proving: '(1) good faith reliance and (2) conformity with the writing relied upon.'" (quoting *EEOC v. Balt. & Ohio R.R. Co.*, 557 F. Supp. 1112, 1122 (D. Md. 1983))). If the employer satisfies these requirements, then Section 10 "affords a complete defense" to liability for violation of the FLSA. *Clifton D. Mayhew, Inc. v. Wirtz*, 413 F.2d 658, 660 (4th Cir. 1969) ("Section 10 . . . affords a complete defense if an employer proves 'that the act or omission complained of was in good faith conformity with and in reliance on any written administrative . . . interpretation' of the Wage and Hour Administrator." (footnote omitted)).

The employer bears the burden of demonstrating that it is entitled to the § 259(a) defense. *De Luna-Guerrero*, 370 F. Supp. 2d at 391 ("For the defense of good faith, the defendants bear the burden of proof."); *see also* 29 C.F.R. § 790.13 ("The relief from liability or punishment provided by sections 9 and 10 of the Portal Act is limited by the statute to employers who both plead and prove all the requirements of the defen[s]e."); *cf. id.* at n.93 ("The requirements of the statute as to pleading and proof emphasize the continuing recognition by Congress of the remedial nature of the Fair Labor Standards Act and of the need for safeguarding the protection which Congress intended it to afford employees."). "This burden is a heavy one, especially because if proven, this defense acts as a bar to the proceeding, absolving defendant from liability and penalties for past violations." *De Luna-Guerrero*, 370 F. Supp. 2d at 391; *see also Blotzer v. L-3 Commc'ns Corp.*, No. CV-11-274-TUC-JGZ, 2012 WL 6086931, at *15 (D. Ariz. Dec. 6,

2012) ("Section 10 of the Portal–to–Portal Act places a high burden of proof on the employer."). "The purpose of the good faith reliance defense is to protect employers who 'innocently and to their detriment follow the law as interpreted by a government agency, without notice that the agency's interpretation was invalid or in error.'" *Martinez-Hernandez*, 2011 WL 4591073, at *2 (quoting *Hultgren v. Cty. of Lancaster*, 913 F.2d 498, 507 (8th Cir. 1990)). "'It is not intended that this defense shall apply where an employer had knowledge of conflicting rules and chose to act in accordance with the one most favorable to him.'" *Id.* (quoting 93 Cong. Rec. 4390 (1947) (statement of Rep. Walter)).

    *i. Reliance*

The Court will first address whether the City actually relied upon a DOL regulation, order, ruling, approval, interpretation, enforcement policy, or practice. To satisfy this prong, "[t]he employer must prove actual reliance on a specific administrative ruling or interpretation." *Blotzer*, 2012 WL 6086931, at *15; *see* 29 C.F.R. § 790.16(a) ("In addition to acting (or omitting to act) in good faith and in conformity with an administrative regulation, order, ruling, approval, interpretation, enforcement policy or practice, the employer must also prove that he actually relied upon it."). Moreover, the particular administrative ruling or interpretation actually relied upon "must provide a clear answer to the particular situation in order for the employer to rely on it." *Blotzer*, 2012 WL 6086931, at *15.

Here, the City asserts that "in establishing an IP overtime program, it relied upon 29 C.F.R. § 778.114, initially as it existed in late 2007, and subsequently upon the DOL published clarification of its interpretation of the regulation in July 2008." (Def.'s Mem. in Supp. Mot. for Partial Summ. J. 11–12.) With respect to the changes made to the IP provision in May 2011, the City asserts that it relied on the DOL's 2011 Final Rule. The City also generally contends that it

relied upon "the full '778 series' . . . including 29 C.F.R. §§ 778.310 and .311 for its determination in or around December 2007 that the IP overtime pay was required to be added to the [FWW] salary in order to compute the regular rate." (*Id.* at 12.)

As an initial matter, the Court is not persuaded by the City's argument that it actually relied upon the DOL's 2008 Notice. First, the 2008 Notice was issued after the City had announced and implemented the IP program. Thus, to the extent the City attempts to rely on the pronouncement as a *post hoc* justification for the 2007 changes to its 1998 Pay Plan, this argument is unavailing. *See Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1209 (2015) (describing 29 U.S.C. § 259(a) as an example of a "safe-harbor provision[] that shelter[s] regulated entities from liability when they act in conformance with *previous* agency interpretations" (emphasis added)). Although Cross asserts that the 2008 Notice "confirmed for [her] that [the City's] prior understanding of [§] 778.114 was correct according to the DOL, and the City continued to rely on that confirmation/interpretation until the DOL reversed itself in April 2011," (Cross. Aff. ¶ 1, Mot. for Partial Summ. J., Ex. D.), this alone is insufficient. *See* 29 C.F.R. § 790.17 ("An employer does not have a defense under these two sections unless the regulation, order, ruling, approval, or interpretation, upon which he relies, is in effect and operation at the time of his reliance."). Second, the City repeatedly highlights the 2008 Notice's use of the word "clarification" as support for its argument that the pronouncement confirmed the City's understanding that its IP provision was in compliance with § 778.114. Although the Court readily acknowledges that the DOL's word choice was confusing, particularly in light of the 2011 Final Rule, the 2008 Notice nevertheless made clear that it was, at bottom, a proposal. *Cf. Powell v. Dallas Morning News L.P.*, 776 F. Supp. 2d 240, 263 (N.D. Tex. 2011) ("Plaintiffs' reliance on the proposed regulation . . . is misplaced because as a 'notice of proposed

rulemaking,' it carries no legal weight or authority. . . . Proposed regulations are entitled to no deference until they are final." (citing *In re AppleTree Mkt., Inc.*, 19 F.3d 969, 973 (5th Cir. 1994))), *aff'd sub nom. Powell v. Dallas Morning News, LP*, 486 F. App'x 469 (5th Cir. 2012); *Ehreth v. Capital One Servs., Inc.*, No. C08-0258RSL, 2008 WL 3891270, at *1 (W.D. Wash. Aug. 19, 2008) ("Plaintiff's reliance on a proposed regulation not yet in force is untenable.").

Notwithstanding the foregoing, because § 778.114 itself qualifies as an "interpretation" for purposes of the § 259(a) defense, the Court will briefly address whether the City actually relied upon this DOL interpretive bulletin. *See* 29 C.F.R. § 790.17(c) ("The term 'interpretation' . . . include[s] bulletins, releases, and other statements issued by an agency which indicate its interpretation of the provisions of a statute." (footnote omitted)); *cf. Martinez v. Hilton Hotels Corp.*, 930 F. Supp. 2d 508, 529 (S.D.N.Y. 2013) ("Because § 778.114 was issued by the [DOL] as an *interpretive bulletin*, however, rather than pursuant to formal notice and comment rulemaking procedures, some courts have declined to afford it deference." (emphasis added)).  On this point, the record is replete with evidence that the City consulted, considered, and actually relied upon § 778.114 in designing its 1998 Pay Plan, in formulating the IP provision, and in implementing the subsequent modifications.  Indeed, the City's various internal memoranda discussing and explaining the 1998 Pay Plan, and the subsequent modifications thereto, repeatedly reference § 778.114 and quote or otherwise incorporate the relevant language from the interpretive rule.  In fact, Cross's May 4, 2011 memorandum to Mayor Riley—which Chief Thomas forwarded to all of the Department's firefighters—was accompanied by a copy of the 2011 Final Rule.  Accordingly, the Court will proceed to consider whether the City has sufficiently demonstrated that it acted in conformity with § 778.114 for purposes of invoking and establishing the good faith defense under § 259(a).

*ii. Conformity*

To establish a valid defense under § 259(a), the City also must establish that it conformed with the dictates of § 778.114. The Fourth Circuit has repeatedly "outlined the conditions for using the [FWW] plan" set forth in § 778.114:

> The language of section 778.114 suggests that an employer must meet the following requirements before it can pay an employee pursuant to the fluctuating workweek method: 1) the employee's hours must fluctuate from week to week; 2) the employee must receive a fixed weekly salary that remains the same regardless of the number of hours that the employee works during the week; 3) the fixed amount must be sufficient to provide compensation at a regular rate not less than the legal minimum wage; 4) the employer and the employee must have a clear, mutual understanding that the employer will pay the employee the fixed weekly salary regardless of the hours worked; and 5) the employee must receive a fifty percent overtime premium in addition to the fixed weekly salary for all hours that the employee works in excess of forty during that week.

*Griffin*, 142 F.3d at 715 (quoting *Flood*, 125 F.3d at 252). In the Fourth Circuit, the employer bears the burden of demonstrating compliance with § 778.114's requirements. *Monahan*, 95 F.3d at 1275 n.12; *see O'Brien v. Town of Agawam*, 350 F.3d 279, 288 n.17 (1st Cir. 2003). Thus, the City bears the burden to demonstrate that its pay plan complied with § 778.114 both as it relates to the merits of Plaintiffs' claims and to establish actual conformity with § 778.114 for purposes of the § 259(a) defense.

The Court has carefully considered the Parties' positions and the relevant legal authorities and concludes that, under the unique circumstances of this case, the "conformity" element of the § 259(a) analysis is too intertwined with the merits to be adequately addressed at this stage. Although the City expressly states that its Motion "is not based on the merits of Plaintiffs' claims," (Def.'s Mot. for Partial Summ. J. 1.), the question of whether the City conformed with the requirements of § 778.114 necessitates a technical assessment of the City's pay plan coupled with an in-depth evaluation of the evidence. While this question may be addressed along with

the merits of Plaintiffs' claims, the record associated with the instant Motion is not sufficiently developed to allow the Court to squarely confront this issue. (*See* Def.'s Mem. in Supp. Mot. for Partial Summ. J. 18 n.42.).

For instance, critical questions such as whether the City's IP provision was properly classified as solely an "overtime premium," either pre- or post-2011, cannot be answered at this juncture.[9] *See Dooley v. Liberty Mut. Ins. Co.*, 369 F. Supp. 2d 81, 85 (D. Mass. 2005); *see also* 29 C.F.R. § 778.310 ("A premium in the form of a lump sum which is paid for work performed during overtime hours *without regard to the number of overtime hours worked* does not qualify as an overtime premium even though the amount of money may be equal to or greater than the sum owed on a per hour basis." (emphasis added)); 29 C.F.R. § 778.311 ("Flat rate is not an overtime premium. The same reasoning applies where employees are paid a flat rate for a special job performed during overtime hours, *without regard to the time actually consumed in performance*." (emphasis added)). Likewise, it is unclear whether the City's IP provision amounted to an hours-based bonus. *See Bacon v. Eaton Aeroquip, LLC*, No. 11-CV-14103, 2014 WL 5090825, at *4–6 (E.D. Mich. Oct. 9, 2014). Therefore, by way of the present Motion, the

---

9.   In explaining the IP provision in 2007, the City provided, *inter alia*, the following example:

> Firefighter Smith has 96 regularly scheduled hours in a [sic] the same particular work period. He volunteers to work an extra unscheduled shift. His normal two-week salary is $1555.00. In addition to his salary, he also will receive $270.00 in incentive pay for the extra shift he volunteered to take. This is added to his salary for a total of $1825.00 in base pay which, for this particular work period, is considered his straight time pay for all hours worked. In this particular work period, he will have worked 120 hours. That means he has a straight time rate of $15.21 this work period. In addition to his straight time, he must also receive an additional half time ($7.61) for all hours over 106. Thus, he will also be paid $106.54 ($7.61 x 14). His total pay for this work period will now be $1931.54.
>
> As you can see, the increase in Smith's earnings for working the single additional shift is more than simply the $270.00 he received as base incentive pay because it also affects overtime pay:
>
> |        | $1931.54 | …. (total pay with extra shift) |
> | minus  | $1555.50 | …..(amount of pay without extra shift) |
> |        | $ 376.54 | (Increase in total pay due to additional shift) |

(Def.'s Mot. for Partial Summ. J., Ex. A, at 6.) As described, it does not appear that the entire IP premium would have constituted an "overtime premium" in this scenario.

City has not carried its significant burden of establishing actual conformity with § 778.114. Because the City has not established actual conformity with the requirements of § 778.114, the Court need not reach the question of the City's good faith at this juncture. *Bollinger v. Residential Capital, LLC*, 863 F. Supp. 2d 1041, 1050 (W.D. Wash. 2012) (declining to consider the parties' arguments regarding the "other § 259 elements" where the defendant did not establish § 259's conformity element as a matter of law). Accordingly, the Court concludes that at this time the City has not carried its "heavy burden" of demonstrating, as a matter of law, that it is entitled to the "complete defense" to liability afforded by § 259(a). *De Luna-Guerrero*, 370 F. Supp. 2d at 391.

### B. Section 260 and the Statute of Limitations

Finally, the Court will briefly address the City's alternative arguments in support of the instant Motion. As noted above, the City argues, in the alternative, that the entry of partial summary judgment in its favor is warranted on the issues of liquidated damages and the applicable statute of limitations. However, because the City's liability is still an open question, the Court declines to reach and decide the City's alternative arguments related to its § 260 affirmative defense and the three-year statute of limitations.[10] *See Longlois v. Stratasys, Inc.*, No. 13-CV-3345 JNE/SER, 2015 WL 774141, at *21 (D. Minn. Feb. 24, 2015) ("With [defendant's] liability still an open question . . . consideration of two of those issues—relating to the statute of limitations and liquidated damages—must be deferred."); *see also Kelley v. TaxPrep1, Inc.*, No. 5:13-CV-451-OC-22PRL, 2015 WL 4488401, at *3 (M.D. Fla. July 22,

---

10. While it remains to be seen whether the City in fact complied with the FLSA, the Court nevertheless notes that despite bearing the burden of proof with regard to willfulness, *Desmond*, 630 F.3d at 358, Plaintiffs have put forward little more than vague allegations and conclusory assertions in support of a three-year statute of limitations. Again, although the Court need not reach this issue absent a determination of liability, *see id.*, the current record is noticeably devoid of any evidence suggesting that the City willfully violated the FLSA. Quite to the contrary, the evidence reveals what appears to have been a diligent effort by the City to craft a creative solution in the aftermath of a tragedy and in response to an unfortunate and unanticipated set of circumstances within the Department.

2015) ("[T]he court cannot make a determination on the issue of willfulness until it is first determined that a violation of the FLSA actually occurred."); *id.* ("Again, because no FLSA violation has been established (or otherwise conceded), consideration of the issue of liquidated damages, and thus the associated affirmative defense of good faith, is premature."); *Switzer v. Wachovia Corp.*, No. CIV.A. H-11-1604, 2012 WL 3685978, at *5 (S.D. Tex. Aug. 24, 2012) ("Absent a violation of the FLSA, there can be no willful violation."); *Cusumano v. Maquipan Int'l, Inc.*, 390 F. Supp. 2d 1216, 1223 (M.D. Fla. 2005) ("In the absence of a determination of an FLSA violation, consideration of the issue of liquidated damages, and thus the associated affirmative defense of good faith, is premature.").   Accordingly, the Court concludes that resolution of the City's alternative arguments at this juncture would be premature.

## CONCLUSION

For the foregoing reasons, it is **ORDERED** that the City's Motion for Partial Summary Judgment is **DENIED**.

**AND IT IS SO ORDERED.**

PATRICK MICHAEL DUFFY
United States District Judge

_____, 2015
**Charleston, South Carolina**

27