**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | |
|---|---|
| James Regan, Jesse Faircloth,<br>Michael Pack, Thomas Haffey,<br>Jacob Stafford, and Kyle Watkins,<br>Each on Behalf of Himself and<br>All Others Similarly Situated,<br><br>    Plaintiffs,<br><br>v.<br><br>City of Charleston, South Carolina,<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

C.A. No.: 2:13-cv-3046-PMD

**ORDER**

This matter is before the Court on cross-motions for summary judgment filed by Defendant City of Charleston, South Carolina ("City") (ECF No. 156) and by Plaintiffs (ECF No. 158). For the reasons set forth herein, both motions are granted in part and denied in part.

**BACKGROUND**

Plaintiffs James Regan, Jesse Faircloth, Michael Pack, Thomas Haffey, Jacob Stafford, and Kyle Watkins ("Plaintiffs"), current or former employees of the City's Fire Department ("Department"), commenced this action on November 7, 2013, on behalf of themselves and others similarly situated, seeking unpaid overtime compensation pursuant to the collective action provision of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b). More specifically, the above-named Plaintiffs, as well as those who have subsequently given notice of their consent to join this action, are current or former firefighters[1] who were paid by the City pursuant to the fluctuating workweek ("FWW") method.

---

1.    For purposes of this Order, the Court refers to all uniformed fire protection and suppression members and employees of the Department as firefighters, without regard to rank.

Plaintiffs' Complaint primarily alleges that the City's pay plan—in particular its incentive-pay ("IP") provision—failed to comply with the statutory and regulatory requirements pertaining to the FWW method.  Plaintiffs' Complaint also asserts claims related to the method by which the City previously compensated firefighter recruit trainees.  Moreover, Plaintiffs' Complaint alleges that certain named Plaintiffs, as well as others similarly situated, were not properly compensated for training hours that they contend constituted compensable time under the FLSA.  Finally, Plaintiffs claim that the City's alleged violations of the FLSA were willful and knowing.  Plaintiffs seek an award of unpaid overtime compensation, liquidated damages in an amount equal to the amount of unpaid overtime compensation, attorneys' fees, costs, and interest.  In response to these allegations, the City admits that it utilized the FWW method but contends that its pay plan complied with the FLSA and all applicable rules and regulations.  Accordingly, the City has denied the asserted claims and any resulting liability.

On February 7, 2014, Plaintiffs moved for conditional certification of a proposed primary class and several subclasses.  Following extensive briefing and a status conference, the Court issued an Order granting in part and denying in part Plaintiffs' Motion for Conditional Certification on July 16, 2014.  Although the Court declined to conditionally certify Plaintiffs' proposed subclasses, the Court did conditionally certify the following primary class:

> All persons employed in a non-exempt capacity by the City of Charleston, South Carolina at any time from November 7, 2010 to the present who served, or trained to serve, as a uniformed suppression member of the City of Charleston Fire Department, and who were paid pursuant to the City's Fluctuating Workweek pay plan.

In conditionally certifying this matter as a collective action, the Court authorized Plaintiffs to provide putative class members with notice of the opportunity to opt-in to this lawsuit.  To date, over 200 firefighters have joined this action.

On February 23, 2015, prior to the discovery deadline, the City filed a motion for partial summary judgment on three affirmative defenses. First, the City argued it was entitled to the complete, "good-faith reliance" defense available under 29 U.S.C. § 259(a). Second, the City contended that the applicable limitations period is two years. Finally, it asked the Court to rule that Plaintiffs could not recover liquidated damages on any claims they might prove. After briefing, the Court denied that motion in an order dated September 14, 2015 ("Prior Order"). In particular, the Court concluded that the City had not established it was entitled to summary judgment on the § 259 defense. As for the limitations period and liquidated damages, the Court found the City's motion premature.

While the City's motion for partial summary judgment was pending, the parties filed the two instant motions on July 2, 2015. In their motion, Plaintiffs ask this Court to hold that five types of acts and omissions by the City violated the FLSA's overtime pay requirements. The City, in its motion, asks this Court to reach the opposite conclusion—that none of its pay practices in question violated the FLSA. Alternatively, the City reasserts its prior request for an order restricting the limitations period to two years and denying Plaintiffs liquidated damages.

Plaintiffs and the City filed Responses in Opposition to each other's motions on July 20, 2015. The City filed a Reply in support of its motion on July 30, and Plaintiffs filed a reply in support of their motion on August 5. Accordingly, both motions are now ripe for consideration.

## STANDARD OF REVIEW

To grant a motion for summary judgment, a court must find that "there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). The judge is not to weigh the evidence but rather must determine if there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). All evidence should be viewed in the light most favorable to the

nonmoving party. *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 124 (4th Cir. 1990). "[I]t is ultimately the nonmovant's burden to persuade [the court] that there is indeed a dispute of material fact. It must provide more than a scintilla of evidence—and not merely conclusory allegations or speculation—upon which a jury could properly find in its favor." *CoreTel Va., LLC v. Verizon Va., LLC*, 752 F.3d 364, 370 (4th Cir. 2014) (citations omitted). "[W]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate." *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 119 (4th Cir. 1991). Summary judgment is not "a disfavored procedural shortcut," but an important mechanism for weeding out "claims and defenses [that] have no factual basis." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

## DISCUSSION

The Court will address the parties' arguments *seriatim*; however, before doing so, both a thorough explanation of the FWW method and a more detailed examination of the City's pay plan are required.

## I.    The FLSA and the FWW Method

### A.    *The FLSA*

The FLSA "is a remedial statute designed to 'eliminate . . . substandard labor conditions' in the United States." *Gaxiola v. Williams Seafood of Arapahoe, Inc.*, 776 F. Supp. 2d 117, 124 (E.D.N.C. 2011) (quoting *Powell v. U.S. Cartridge Co.*, 339 U.S. 497, 510 (1950)). "The FLSA is best understood as the 'minimum wage/maximum hour law.'" *Trejo v. Ryman Hosp. Props., Inc.*, 795 F.3d 442, 446 (4th Cir. 2015) (quoting *Monahan v. Cty. of Chesterfield*, 95 F.3d 1263, 1266 (4th Cir. 1996)). "In enacting the FLSA, Congress intended 'to protect all covered workers from substandard wages and oppressive working hours.'" *Id.* (quoting *Barrentine v. Ark.–Best*

*Freight Sys., Inc.*, 450 U.S. 728, 739 (1981)).  Consequently, the FLSA's substantive sections "'narrowly focus[] on minimum wage rates and maximum working hours,'" *id.* (quoting *Monahan*, 95 F.3d at 1267), requiring the payment of a minimum wage and providing specific limits on the maximum hours an employee may work without receiving the requisite overtime compensation, *see id.* (citing 29 U.S.C. §§ 206(a), 207(a)).  Following the Supreme Court's decision in *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528 (1985), these requirements also apply to state governments and their municipal subdivisions.  *See West v. Anne Arundel Cty.*, 137 F.3d 752, 760 (4th Cir. 1998) (citing *Garcia*, 469 U.S. 528); *Monahan*, 95 F.3d at 1267 (same).

The FLSA "generally requires employers to compensate employees at the overtime rate for all work performed over 40 hours per week."  *Roy v. Cty. of Lexington*, 141 F.3d 533, 538 (4th Cir. 1998); *see also Flood v. New Hanover Cty.*, 125 F.3d 249, 251 (4th Cir. 1997) ("As a general rule, the FLSA provides that an employer may not employ an employee for a workweek longer than forty hours unless it pays its employee one and one-half times the employee's 'regular rate' for all hours in excess of forty.").  The general rule is that an employer must pay employees overtime using the "time-and-a-half method" for work performed in excess of forty hours per week.  29 U.S.C. § 207(a)(1) ("[N]o employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.").  However, Section 7(k) of the FLSA "provides a partial exemption for those public agencies employing persons 'engaged in fire protection or law enforcement activities,' by increasing the number of hours such employees must work above the regular 40-hour workweek before they are entitled to overtime

compensation." *Roy*, 141 F.3d at 537; *see also Monahan*, 95 F.3d at 1267 ("Recognizing the unique nature of the work performed by police officers and firefighters, Congress provided a partial exemption to the FLSA's overtime requirements for public agency employers." (citing 29 U.S.C. § 207(k))).    As to the former category, "a public employer need not compensate firefighters at the overtime rate until they have worked an aggregate of 212 hours for a period of 28 consecutive days (53 hours per week)." *Roy*, 141 F.3d at 538.    Accordingly, pursuant to 29 U.S.C. § 207(k) and the schedule outlined in the applicable implementing regulation, a public employer's duty to compensate firefighters at the requisite overtime rate is not triggered until the employee has worked fifty-three hours in a given workweek. *See id.* at 538–39; *see also* 29 C.F.R. § 553.230(a), (c) (providing that for employees engaged in fire protection activities who have a fourteen-day work period, "overtime compensation (in premium pay or compensatory time) is required for all hours worked in excess of [106]").

Although the FLSA provides different methods by which employers may calculate compensation to ensure that they pay their employees in a manner that complies with the FLSA's minimum wage and overtime provisions, covered employees are entitled to receive overtime compensation whether they are paid on an hourly basis or are paid a salary. *See* 29 C.F.R. §§ 778.110, 778.113.    As noted above, the FLSA generally requires overtime compensation "at a rate not less than one and one-half times the *regular rate* at which he is employed." 29 U.S.C. § 207(a)(1) (emphasis added).    Thus, the "keystone" of § 207(a)(1) is the "regular rate." *Walling v. Youngerman-Reynolds Hardwood Co.*, 325 U.S. 419, 424 (1945).    "On that depends the amount of overtime payments which are necessary to effectuate the statutory purposes.    The proper determination of that rate is therefore of prime importance." *Id.*

Under the FLSA, an employee's regular rate is calculated as an hourly rate.  29 C.F.R. § 778.109; *see also Urnikis-Negro v. Am. Family Prop. Servs.*, 616 F.3d 665, 673 (7th Cir. 2010) ("For purposes of the overtime calculation, an employee's regular rate of pay is the amount of compensation he receives per hour." (citing 29 C.F.R. § 778.109)).  However, the fact that the regular rate is expressed as an hourly rate does not mean that employers must pay their employees by the hour to comply with the FLSA's mandates; "employees may, in practice, be paid in a variety of other ways."  *Urnikis-Negro*, 616 F.3d at 673.  Thus, the method of calculating an employee's regular rate depends on the manner in which the employee is compensated.

Logically, this regular rate determination is quite simple for employees paid strictly on an hourly basis—the regular rate is the employee's hourly rate or wage.  *See* 29 C.F.R. § 778.110. "If the employer employs an employee on a weekly salary basis, it determines the employee's regular hourly rate of pay by dividing the weekly salary by the number of hours that it intends the weekly salary to compensate."  *Flood*, 125 F.3d at 251; *see* 29 C.F.R. § 778.113. "Calculating overtime pay becomes more complicated, however, when an employee is paid a fixed weekly salary for hours that fluctuate each week."  *Wills v. RadioShack Corp.*, 981 F. Supp. 2d 245, 254 (S.D.N.Y. 2013).  "For such employees, employers are permitted to use the FWW method to comply with the FLSA's overtime requirement."  *Id.*; *see* 29 C.F.R. § 778.114.

### B.  The FWW Method

The FWW method is derived from the Supreme Court's decision in *Overnight Motor Transportation Co. v. Missel*, 316 U.S. 572 (1942), decided four years after the passage of the FLSA.  *See generally Cash v. Conn Appliances, Inc.*, 2 F. Supp. 2d 884, 893 & n.16 (E.D. Tex. 1997) (outlining, in greater detail, the origins of the FWW method).  In *Missel*, the Court

addressed how to calculate overtime compensation under 29 U.S.C. § 216(b) for employees who are paid a fixed weekly salary for all hours worked but who work irregular, fluctuating, or variable hours. *See Desmond v. PNGI Charles Town Gaming, L.L.C.*, 630 F.3d 351, 354 (4th Cir. 2011) (discussing *Missel*). The Court concluded that for such employees, employers could calculate the employee's regular rate under the FLSA by dividing the employee's fixed weekly salary by the actual number of hours worked during that workweek. *See Misssel*, 316 U.S. at 580 ("No problem is presented in assimilating the computation of overtime for employees under contract for a fixed weekly wage for regular contract hours which are the actual hours worked, to similar computations for employees on hourly rates. Where the employment contract is for a weekly wage with variable or fluctuating hours the same method of computation produces the regular rate for each week." (footnote omitted)); *see also Wills*, 981 F. Supp. 2d at 254 ("The Court held that employers could, under the FLSA, calculate an employee's regular rate by dividing a fixed weekly salary by fluctuating hours, and then use that rate as the basis for calculating overtime pay.").

In outlining what is now known as the FWW method, the Court noted that because the FLSA requires that an employee's remuneration "be reduced by some method of computation to hourly rates," *Missel*, 316 U.S. at 579, where an employee's hours fluctuate from week to week, the employee's regular rate will also vary each week, *id.* at 580. Nevertheless, the Court explained that because "that rate is on an hourly basis, it is regular in the statutory sense inasmuch as the rate per hour does not vary for the entire week, though week by week the regular rate varies with the number of hours worked." *Id.* Although recognizing that using this method necessarily meant that "the longer the [employee's] hours the less the rate and the pay per hour," the Court stated that "[t]his is not an argument . . . against this method of determining the regular

rate of employment for the week in question." *Id.* "[T]he lasting significance of the [*Missel*] decision is its approval under the FLSA of paying an employee a flat weekly salary for fluctuating hours so long as a premium is also paid of at least 'fifty per cent additional for the hours actually worked over the statutory maximum.'" *Wills*, 981 F. Supp. 2d at 254 (quoting *Missel*, 316 U.S. at 581).

In 1968, the United States Department of Labor ("DOL") promulgated an interpretative rule, titled "[f]ixed salary for fluctuating hours," 29 C.F.R. § 778.114, "which clarified how and when employers could use the 'half-time' method discussed in *Missel* to calculate overtime pay," *Wills*, 981 F. Supp. 2d at 255; *see also Snodgrass v. Bob Evans Farms, LLC*, No. 2:12-CV-768, 2015 WL 1246640, at *8 (S.D. Ohio Mar. 18, 2015) (describing § 778.114 as "an interpretive rule intended to codify the Supreme Court's decision in *Missel*"). The rule defines the FWW method and "sets forth a complicated mathematical formula for calculating overtime pay due under the FLSA."[2] *Duprey v. Scotts Co.*, 30 F. Supp. 3d 404, 409 (D. Md. 2014). "The FWW

---

2. Section 778.114 provides, in relevant part, as follows:

> An employee employed on a salary basis may have hours of work which fluctuate from week to week and the salary may be paid him pursuant to an understanding with his employer that he will receive such fixed amount as straight time pay for whatever hours he is called upon to work in a workweek, whether few or many. Where there is a clear mutual understanding of the parties that the fixed salary is compensation (apart from overtime premiums) for the hours worked each workweek, whatever their number, rather than for working 40 hours or some other fixed weekly work period, such a salary arrangement is permitted by the Act if the amount of the salary is sufficient to provide compensation to the employee at a rate not less than the applicable minimum wage rate for every hour worked in those workweeks in which the number of hours he works is greatest, and if he receives extra compensation, in addition to such salary, for all overtime hours worked at a rate not less than one-half his regular rate of pay. Since the salary in such a situation is intended to compensate the employee at straight time rates for whatever hours are worked in the workweek, the regular rate of the employee will vary from week to week and is determined by dividing the number of hours worked in the workweek into the amount of the salary to obtain the applicable hourly rate for the week. Payment for overtime hours at one-half such rate in addition to the salary satisfies the overtime pay requirement because such hours have already been compensated at the straight time regular rate, under the salary arrangement.

29 C.F.R. § 778.114(a).

half-time calculation under *Missel* does not differ from the FWW half-time calculation under § 778.114. Both . . . use the exact same formula." *Snodgrass*, 2015 WL 1246640, at *7.

As set forth in § 778.114, the FWW method authorizes an employer to pay an employee a preset, predetermined weekly salary "as straight time pay for whatever hours he is called upon to work in a workweek, whether few or many," provided both that the fixed salary is sufficient to compensate the employee for hours worked "at a rate not less than the applicable minimum wage" and that the employer pays the employee overtime compensation "at a rate not less than one-half of his regular rate of pay." 29 C.F.R. § 778.114(a). Section 778.114 expressly states that the employee's regular rate "will vary from week to week and is determined by dividing the number of hours worked in the workweek into the amount of the salary to obtain the applicable hourly rate for the week." *Id.* According to the rule, paying the employee half or 50% of the regular rate for all hours worked in excess of the applicable statutory maximum, as opposed to 150% under the time-and-a-half method, "satisfies the overtime pay requirement because such hours have already been compensated at the straight time regular rate, under the salary arrangement." *Id.*; *see Flood*, 125 F.3d at 252 ("Since the employer has already paid the employee a regular rate of pay for all of the hours that the employee worked, including the overtime hours, it only has to pay an additional one-half time pay premium for the overtime hours." (citing 29 C.F.R. § 778.114(a); *Monahan*, 95 F.3d at 1280–81)). "In other words, because the fixed salary compensates the employee for all the hours worked that week—whether more or less than [the statutory maximum]—paying an additional 50% of the 'regular rate' for every hour above [the statutory maximum] complies with the FLSA's requirement that employers pay time-and-a-half for overtime hours." *Wills*, 981 F. Supp. 2d at 255.

Although this amounts to a departure from the standard time-and-a-half overtime premium, the Fourth Circuit has made clear that the FWW method is not an "exception" to the FLSA; instead, it merely represents "an alternative way for employers to calculate the regular rate of pay for certain salaried employees." *Flood*, 125 F.3d at 251. While the FWW method is not a pure statutory construct, it is nevertheless "a recognized method of compensation under the FLSA." *Griffin v. Wake Cty.*, 142 F.3d 712, 714 (4th Cir. 1998). The FWW method offers benefits for both employees and employers. As to the former, "[t]he plan allows employees the advantages of a base salary irrespective of the hours worked along with some overtime pay for hours in excess of forty per week." *Id.* Likewise, "[t]he system enables the employer to place workers on a variable schedule tailored to the nature of their work without incurring prohibitive overtime costs for weeks in which the hours are the longest." *Id.*

On July 28, 2008, the DOL issued a notice of proposed rulemaking and request for comments regarding "proposed revisions" to regulations issued under the FLSA and the Portal–to–Portal Act of 1947, 29 U.S.C. §§ 251 *et seq.* ("2008 Notice"). Updating Regulations Issued Under the Fair Labor Standards Act, 73 Fed. Reg. 43654-01 (proposed July 28, 2008). Although the 2008 Notice detailed a number of proposed modifications or revisions to the FLSA's implementing regulations, only the proposed revision to § 778.114 is relevant here. In this regard, the DOL announced that "the regulations governing the [FWW] method of computing half-time overtime pay for salaried nonexempt employees who work variable or fluctuating hours from week to week are in need of clarification and updating to delete outmoded examples and eliminate confusion over the effect of paying bonus supplements and premium payments to affected employees." *Id.* at 43655–56.

11

In addition to providing the text of this proposed amendment to § 778.114,[3] the 2008 Notice also included an enlightening three-paragraph discussion of the DOL's proposal. The DOL began its discussion by summarizing the requirements of the "current regulation" and again noting that "[t]he proposed rule would . . . clarify the [DOL's] regulation at [§ 778.114] addressing the [FWW] method of computing overtime compensation for salaried nonexempt employees." *Id.* at 43662. After discussing the "current regulation," the 2008 Notice observed that "[t]he payment of additional bonus supplements and premium payments to employees compensated under the [FWW] method has presented challenges to both employers and the courts in applying the current regulations." *Id.* Accordingly, in view of these "challenges," the DOL offered the "proposed regulation," which "provide[d] that bona fide bonus or premium payments do not invalidate the [FWW] method of compensation, but that such payments (as well as 'overtime premiums') must be included in the calculation of the regular rate unless they are excluded by FLSA sections 7(e)(1)–(8)." *Id.*; *see also Wills*, 981 F. Supp. 2d at 250 (explaining that the proposed amendment of § 778.114 "would have stated that an employer's payment of bonuses to an employee did not prevent the employer from using the FWW method to calculate the employee's overtime"). Lastly, as justification for the proposed revision, the DOL asserted that its proposal was consistent with *Missel*, explained that "[p]aying employees bonus or premium payments for certain activities such as working undesirable hours is a common and beneficial practice for employees," and predicted that its "proposed clarification would eliminate

---

3. The 2008 Notice proposed adding the following sentence to the end of 29 C.F.R. § 778.114(a): "Payment of overtime premiums and other bonus and non-overtime premium payments will not invalidate the [FWW] method of overtime payment, but such payments must be included in the calculation of the regular rate unless excluded under section 7(e)(1) through (8) of the [FLSA]." 73 Fed. Reg. at 43670. Additionally, to explain the proposed revision to subsection (a), the DOL proposed amending § 778.114(b) to include an example "where an employer pays an employee a nightshift differential in addition to a fixed salary." *Id.* at 43662; *see id.* at 43670.

any disincentive for employers to pay additional bona fide bonus or premium payments." 73 Fed. Reg. at 43662.

On April 5, 2011, after receiving comments in response to the 2008 Notice, the DOL issued its final rule ("2011 Final Rule"), which took effect on May 5, 2011.  Updating Regulations Issued Under the Fair Labor Standards Act, 76 Fed. Reg. 18832-01 (Apr. 5, 2011). Although the 2011 Final Rule contained a number of new regulations, the DOL announced that after considering the comments submitted in response to the 2008 Notice, it had decided against implementing the proposed revisions to § 778.114 and would leave the substantive text unchanged.[4]  *See Snodgrass*, 2015 WL 1246640, at *11 (summarizing how the DOL "backtracked").  In explaining its decision not to adopt the proposed revisions outlined in the 2008 Notice, the DOL stated that "[w]hile the Department continues to believe that the payment of bonus and premium payments can be beneficial for employees in many other contexts, we have concluded that unless such payments are overtime premiums, they are incompatible with the fluctuating workweek method of computing overtime under section 778.114." 76 Fed. Reg. at 18850.  Further explaining its departure from the proposal set out in the 2008 Notice, the DOL noted that the previously proposed rule "would have been inconsistent with the requirement of a fixed salary payment set forth by the Supreme Court in [*Missel*]." *Id.*  Additionally, the DOL stated that, after "closer examination," it "is persuaded that the courts have not been unduly challenged in applying the current regulation to additional bonus and premium payments." *Id.* Accordingly, the DOL decided to "restore the current rule," having concluded that it would not be appropriate "to expand the use of [the FWW] method of computing overtime pay beyond the

---

4.   The 2011 Final Rule did make several non-substantive "[e]ditiorial revisions" to § 778.114, such as deleting gender-specific references and updating the examples to include wages above the minimum wage.  76 Fed. Reg. at 18850.

scope of the current regulation." *Id.*; *see also Wills*, 981 F. Supp. 2d at 250 (summarizing the 2011 Final Rule).

## II.    The City's Pay Plan

In 1996, the City was sued by some of its firefighters alleging improper use of the sleep-time provisions of 29 C.F.R. Part 553.   In 1998, as a part of and in conjunction with the settlement of that lawsuit, the City adopted a new pay plan using the FWW method as set forth in 29 C.F.R. § 778.114.  The plan provided, in relevant part, as follows:

> B.    Each employee shall be paid bi-weekly.
> . . . .
> 2.    Salaried employees will be paid an amount, bi-weekly, equivalent to the annual salary divided by 26 (regular pay).  Regular pay shall be paid, per pay period, regardless of the number of hours, or increments thereof, worked during the applicable pay period.  No deductions from regular pay shall be made for part day or part tour of duty absences.
>
> C.    Employees eligible for overtime compensation pursuant to the [FLSA] and applicable [DOL] Regulations shall be paid overtime as follows:
> . . . .
> 2.    Salaried employees will be paid overtime for each hour, or increment thereof, in excess of 106 per bi-weekly pay period.  This overtime premium shall be calculated by dividing the regular pay by the number of hours, or increments thereof, worked in the pay period, and by multiplying this figure by .5.  In bi-weekly pay periods where overtime is due, the employee shall receive his regular pay, plus the overtime premium calculated in accordance with the previously described formula and in accordance with 29 C.F.R. Sec. 778.114.

(Def.'s Mot. for Partial Summ. J., Ex. C., Settlement Agreement, Ex. B., Personnel Policy 1–2, ECF No. 126-4, at 8–9.)  The City continued to utilize the plan until January 2008, when the City altered its compensation plan for reasons outlined herein.

On June 18, 2007, the City, its citizens, and the Department suffered an unspeakable loss when nine firefighters lost their lives in a structure fire.  In the wake of this tragedy, the City's mayor, Joseph P. Riley, Jr., commissioned a panel to review various Department practices and policies and to offer suggestions regarding possible ways to improve the Department's

operations.  The resulting report proposed, *inter alia*, increasing the number of shifts, the number

of firefighters on certain shifts, or both; however, in order to implement such policies, the

Department needed to significantly expand its workforce.  Yet, the Department had just lost nine

of its firefighters to the fire, as well as a number of others due to injuries and resulting issues

such as post-traumatic stress disorder.  Given the delay associated with recruiting and training

entry-level employees, the policy changes necessarily meant that existing firefighters would be

required to work an unanticipated number of extra shifts in the interim.

### A.  The IP Program

According to the City, filling new shifts with current employees "was further complicated

by the fact that the operation of a[n FWW] plan results in a diminishing overtime premium with

increased number of hours."  (Def.'s Mem. in Supp. Mot. for Partial Summ. J., ECF No. 126-1,

at 4.)  Therefore, to incentivize firefighters to assume the additional workload, the City added the

IP provision to its pay plan.  In a December 11, 2007 memorandum to then-Chief Rusty Thomas,

Mayor Riley summarized the IP provision as follows:

> The [D]epartment will now offer a special incentive pay for any fire
> protection employee who works *extra unscheduled* shifts.  This incentive program
> will offer additional incentive pay that is over and above what our pay plan would
> otherwise require.  To participate in this incentive pay program during any
> particular work period, an employee must have actually worked all of his
> regularly scheduled shifts in that particular two-week work period.  In other
> words, an employee cannot participate in the incentive program in work periods
> in which he takes annual leave, sick or other leave.  The incentive pay for an extra
> unscheduled shift will be:
>
> | | |
> |---|---|
> | Captain: | $340.00 |
> | Engineer: | $310.00 |
> | Assistant Engineer: | $290.00 |
> | Fire Fighter: | $270.00 |
>
> In addition to the flat rate incentive fee outlined above, the employee will
> also receive the "half time" overtime that our current pay plan would ordinarily
> pay for overtime hours.  The incentive pay will also have the effect of increasing
> the rate paid for *all* overtime (even regularly scheduled overtime) that the

15

employee works in that particular work period because it will be added to the base salary for purposes of overtime calculations.
     Although this is not a conventional "time-and-a-half" overtime program, the net result is that the affected employee will receive, *on average*, an amount comparable to what he would have received under a time-and-a-half plan.

(Def.'s Mot. for Partial Summ. J., Ex. A, ECF No. 126-2, at 3–4.)  Additionally, Mayor Riley noted that while the IP provision "is considered temporary, there is no current 'end' date set as of yet."  (*Id.* at 4.)  To further explain the change, Mayor Riley attached an exhibit containing a number of examples designed to illustrate how the IP program would work.

On December 12, 2007, Chief Thomas sent a memorandum to "All Fire Protection Shift Employees" addressing the issue of the increased need for unscheduled overtime.   In his memorandum, Chief Thomas explained that the demand for unscheduled overtime should decrease as additional firefighters are hired and trained but that "[i]n the interim, the City has announced an incentive program which will provide additional compensation to those fire department employees who step in to fill these overtime needs."  (*Id.* at 2.)  Chief Thomas also attached a copy of Mayor Riley's memorandum to his own, highlighting the accompanying examples and explaining that "[a]lthough we do not have a conventional 'time-and-a-half pay program, the incentive pay plan works in tandem with our current pay plan to provide pay that, on average, is comparable to time and a half."  (*Id.*)

Shortly after the City introduced and implemented the IP provision, the City's human resources director, Kay Cross ("Cross") became aware of the DOL's 2008 Notice.  Cross states in her affidavit that "[t]he information in the publication confirmed for me that our prior understanding of [§] 778.114 was correct according to the DOL, and the City continued to rely on that confirmation/interpretation until the DOL reversed itself in April 2011."  (Cross. Aff. ¶ 1,

Def.'s Mot. for Partial Summ. J., Ex. D, ECF No. 126-5, at 2.)  The City did not make any changes to the IP provision at that time.

### B.  Recruit Training Pay

Historically, the City hired only persons who were already fully certified firefighters. Because those recruits were already certified and had substantial prior training, those recruits fell under the 53-hour workweek exception in 29 U.S.C. § 207(k).  *See* 29 C.F.R. § 553.210(a) (explaining that § 207(k) applies to firefighters who are, *inter alia*, "trained in fire suppression" and have "the legal authority and responsibility to engage in fire suppression").  Accordingly, the City applied the 53-hour workweek exception, rather than the general 40-hour rule, to all its recruits while they underwent a two-week orientation program.  During their training, recruits were salaried employees, and the City applied the FWW method to them.

In 2009, however, the City opened its applicant pool to candidates who had not yet obtained the required certification or training.  To adequately train uncertified hires, it also implemented a much more intensive training program that lasted several months.  The City continued to apply the FWW method to all new recruits.  It also continued to apply the 53-hour workweek maximum to all recruits, including those who were uncertified.  As the City now admits, those uncertified recruits did not meet the criteria of § 553.210(a), and thus the City should have applied the 40-hour workweek maximum to them.  For such recruits, the City's error had the effect of denying them up to twenty-six hours' worth of overtime premiums per pay period.

In 2011, Cross learned that the City had been erroneously using the 53-hour workweek to determine the overtime compensation for uncertified trainees.  Acting in conjunction with an attorney who practices employment law, the City voluntarily reported the error to the DOL and

provided each affected recruit all half-time overtime back pay owed, as well as an additional sum representing potential liquidated damages.[5]  The City also amended its payment practices so that prospectively, all recruits' overtime would be calculated using the correct maximum workweek standard.  The new practices were first implemented with the recruit class that began on November 1, 2011.

### C.  Holiday and Standby Premiums

Due to the nature of the job, firefighters sometimes have to work during holidays. Likewise, firefighters are also occasionally required to stay on duty past their required shifts to cover for co-workers who are sick or late.  For several of the years that the City used the FWW method, the City provided firefighters who worked on holidays the choice of either adding 9.6 hours to their leave balance or receiving 9.6 hours' worth of pay.  As for firefighters who stayed past their shifts, the City provided them "standby" pay in addition to their salaries.

### D.  Pay for Special Teams Training

The Department has several teams of firefighters who are trained to perform specialized tasks, such as the handling of hazardous materials; the location, extrication, and initial medical stabilization of victims trapped in confined spaces; and the operation of marine craft for fire suppression activities.  The City requires the members of these special teams to obtain and maintain certifications in their respective specialties and to attend a certain amount of training each year.  According to Plaintiffs, special teams members often undergo that certification and training without pay.

---

5.    The City did not admit that it owed any recruit liquidated damages.  Rather, it told the affected recruits it was paying liquidated damages voluntarily because it valued their service and wanted to treat them fairly.

### E. Pay Plan Modifications in 2011

On May 4, 2011, after learning of the DOL's 2011 Final Rule, Cross sent a memorandum to Mayor Riley "outlin[ing] certain modifications to the CFD non-exempt pay plan which are necessary to comply with recent changes in federal law." (Def.'s Mot. for Partial Summ. J., Ex. E, ECF No. 126-6, at 3.) In her memorandum, Cross explained the circumstances that led to the "modifications":

> On April 11, 2011, the [DOL] amended its regulations relating to the [FWW] pay method. Under these new regulations and the Agency comments accompanying them, employers utilizing the method are strictly prohibited from paying any additional pay on top of the fixed base salary to employees *other than overtime pay*. Although the law does not require than an employer using the method pay more than a half time overtime premium, that is a minimum, and there is no prohibition on paying a greater overtime premium. Fortunately, the City's IP program is limited to paying only when overtime is actually worked, so that additional pay program can stay intact with only one minor modification as discussed below. However, there are some relatively minor aspects of the pay plan which must undergo certain changes as are explained below. The new DOL rules become effective on May 5, 2011, so all of the changes set forth below will be implemented during the first pay period beginning thereafter, which begins on May 14, 2011.

(*Id.* at 4 (footnote omitted).) In a footnote, Cross discussed the DOL's 2008 Notice:

> The proposed version of these amended regulations came out in 2008. Ironically, the initial proposed regulations "clarified" that employers were not prohibited from paying additional straight time pay so long as the base salary was never reduced. As it happened, the DOL reversed itself and announced in the final regulations that additional pay for regular hours is now prohibited.

(*Id.* at n.1.) With regard to the actual impact of the 2011 Final Rule on the City's use of the IP provision, Cross stated as follows:

> As discussed above, the change in DOL position will have very little effect on the City's IP program because that program has always been available only as an overtime premium pay. CFD employees who worked "extra" shifts, but did not work all of their regularly scheduled hours were not eligible for and did not receive any additional pay because they did not work overtime. The amended regulations confirm that the half time overtime provision is a minimum only—additional overtime premiums are permitted by law and will continue to be.

As a single exception, the City will modify how it calculates the IP flat rate on the first IP shift worked during an employee's short work period. Rather than simply pay a full flat IP fee for that shift, the flat fee will be prorated so that it directly corresponds with the number of overtime hours actually worked in that two-week period. In other words, if the employee has worked no other additional hours that period other than his normal 96, the first ten hours of the extra shift are, technically non-overtime hours. In contrast, the remaining 14 hours are actual overtime hours. Thus, going forward, an employee in that situation would be paid a prorated flat fee based on the actual number of overtime hours worked. This change will make the calculation of IP more uniform (since that is how it is currently calculated in a long work period) and will protect the legal integrity of our pay plan.

(*Id.* at 5–6.)

Cross also stated that, due to the 2011 Final Rule, the City would no longer pay firefighters an additional amount for working holidays and would no longer provide standby pay to firefighters who stayed on duty past their shifts.

Then-Chief Thomas Carr subsequently emailed a copy of Cross's memorandum to all firefighters. The changes to the pay plan outlined by Cross took effect on May 14, 2011.

The City contends that once it implemented the modifications outlined in the May 4, 2011 memorandum, its FWW-based pay plan and IP provision "remained unchanged until its cessation on February 28, 2014." (Def.'s Mem. in Supp. Mot. for Partial Summ. J., ECF No. 126-1, at 7.) On February 28, 2014, the City transitioned to an hourly pay plan that utilizes the standard time-and-a-half method of calculating overtime compensation. According to the City, its implementation of an hourly pay plan was unrelated to the filing of this lawsuit.

## III.    Analysis

As explained herein, there is no genuine dispute of material fact that certain City pay practices did not comply with the FLSA. However, the record also demonstrates that none of those violations was willful and that an award of liquidated damages in this case would be inappropriate.

### A.  Compliance with § 778.114

Plaintiffs assert that the City's IP premiums, holiday pay, and standby pay all precluded the City from using the FWW method.  They also assert that the City violated § 778.114 by failing, in two instances, to make required payments of overtime premiums.  The Court addresses each potential violation *seriatim*.

The Fourth Circuit has repeatedly "outlined the conditions for using the [FWW] plan" set forth in § 778.114:

> The language of section 778.114 suggests that an employer must meet the following requirements before it can pay an employee pursuant to the fluctuating workweek method: 1) the employee's hours must fluctuate from week to week; 2) the employee must receive a fixed weekly salary that remains the same regardless of the number of hours that the employee works during the week; 3) the fixed amount must be sufficient to provide compensation at a regular rate not less than the legal minimum wage; 4) the employer and the employee must have a clear, mutual understanding that the employer will pay the employee the fixed weekly salary regardless of the hours worked; and 5) the employee must receive a fifty percent overtime premium in addition to the fixed weekly salary for all hours that the employee works in excess of forty during that week.

*Griffin*, 142 F.3d at 715 (quoting *Flood*, 125 F.3d at 252).  In the Fourth Circuit, the employer bears the burden of demonstrating compliance with § 778.114's requirements.  *Monahan*, 95 F.3d at 1275 n.12.  If the employer fails to prove it complied with all five requirements, the court must conclude that the employer's use of § 778.114 was improper.  *See Aiken v. Cty. of Hampton*, 172 F.3d 43, at *2 (4th Cir. 1998) (per curiam) (table) (stating defendant "must fulfill the five requirements set forth in section 114 in order to use the 'fluctuating workweek' method of payment"); *Bacon v. Eaton Aeroquip, LLC*, No. 11-CV-14103, 2014 WL 5090825, at *8 (E.D. Mich. Oct. 9, 2014) (granting summary judgment on issue of compliance with the FWW method after holding shift premium violated fixed-salary requirement); *Brumley v. Camin Cargo Control, Inc.*, No. CIVA 08-1798 (JLL), 2010 WL 1644066, at *3 (D.N.J. Apr. 22, 2010) ("Camin can

21

only succeed on summary judgment with respect to the FWW if the undisputed material facts demonstrate that it is entitled to the FWW, while Plaintiffs will succeed if they can demonstrate that there is no factual dispute that one of the requirements was not met."); *Rainey v. Am. Forest & Paper Ass'n*, 26 F. Supp. 2d 82, 101 (D.D.C. 1998) (holding that by failing to prove fifth requirement, employer lost on issue of whether it properly used the FWW method).

"Before the DOL issued its Final Ruling in 2011, almost every court to have addressed the issue had held that paying an employee hours-based, or time-based, bonuses and premiums— such as extra pay for holiday, weekend, or night work—offended § 778.114's requirement of a 'fixed weekly salary.'" *Wills*, 981 F. Supp. 2d at 255–56; *see also id.* at 256 (collecting cases). Those courts recognized that employees who work extra hours in exchange for extra pay above their base salaries "cannot be said to receive a 'fixed salary' *regardless of hours worked*; on the contrary, employees who worked 'premium' hours would receive more pay." *Id.* at 256. In its April 2011 Final Ruling, the DOL confirmed that paying time-based premiums precludes use of the FWW method. 76 Fed. Reg. at 18850; *see Wills*, 981 F. Supp. 2d at 258, 259 (stating the 2011 Final Rule "maintain[ed] the status quo" and "left intact" the prior court decisions holding that time-based premiums are incompatible with the FWW method).

In its Prior Order, the Court declined to address whether the City's pay practices conformed with § 778.114 because doing so "necessitates a technical assessment of the City's pay plan coupled with an in-depth evaluation of the evidence," and it was premature to undertake such an analysis in the context of a motion addressing only affirmative defenses. Prior Order at 24. However, now that the parties have put that question squarely before the Court, it concludes the City has failed to prove that its IP, holiday, and standby premiums were compatible with the FWW method.

i.    *IP Premiums*

There is no question that the IP program operated as an exchange of extra money for extra hours worked.  City representatives confirmed that when the City introduced the IP provision in 2007.  For example, then-Chief Thomas wrote in a December 12, 2007 memorandum that the IP program "will provide additional compensation to those fire department employees who step in to fill . . . overtime needs."  (Def.'s Mot. for Summ. J., Ex. A, Thomas Mem., ECF No. 156-2, at 1.)  Nine days later, another City official explained to firefighters that "[t]he point of the [IP] program is to provide additional compensation to employees who have to work and be away from their families for more shifts and hours than their regular schedule would require."  (Def.'s Mot. for Summ. J., Ex. A, Bedard Email, ECF No. 156-2, at 1.)  Moreover, after the DOL issued its 2011 Final Rule, Cross reiterated that even after the Final Rule, "[t]he basic premise of the IP program" remained the same: "an employee who is assigned to work an additional shift which constitutes overtime is paid an additional flat rate premium for doing so." (Def.'s Mem. in Opp. Pl. Mot. for Summ. J., Ex. A, Cross Mem., ECF No. 159-1, at 2.)  Finally, IP premiums were time-based, in that a firefighter who worked an extra unscheduled shift would not be paid an IP premium if, in that pay period, he had taken any type of leave or had not worked all of his scheduled shifts.  *See Gibbons v. Office Depot, Inc.*, No. 12-CV-2992(DMC), 2013 WL 1890265, at *2 (D.N.J. Feb. 22, 2013) (holding that employer's policy providing employees additional premiums for working holidays, but only if they also worked at least forty hours, violated fixed-salary requirement).

Many courts have held that paying employees extra to work on days they were scheduled to be off-duty is incompatible with the fixed-salary requirement.  *See, e.g.*, *Brantley v. Inspectorate Am. Corp.*, 821 F. Supp. 2d 879, 890 (S.D. Tex. 2011) (holding employer violated

fixed-salary requirement by paying employees extra for working on scheduled days off); *Brumley*, 2010 WL 1644066, at *6–7 (same); *Adeva v. Intertek USA, Inc.*, No. CIV. A. 09-1096 (SRC), 2010 WL 97991, at *2 (D.N.J. Jan. 11, 2010) (same); *Ayers v. SGS Control Servs., Inc.*, No. 03 CIV. 9078 RMB, 2007 WL 646326, at *10 (S.D.N.Y. Feb. 27, 2007) (same). Such holdings are quite logical. Paying an employee more money to work more hours is precisely the opposite of paying the employee "a fixed weekly salary regardless of how many hours the employee may work in a given week." *O'Brien v. Town of Agawam*, 350 F.3d 279, 287 (1st Cir. 2003) (internal quotations and citation omitted). Seeing no meaningful distinction between the City's IP premiums and the day-off premiums discussed in the cases cited above, the Court concludes that the IP premiums were impermissible day-off premiums.

The City does not deny that the IP premiums were hours-based. In fact, despite having the burden of proof on this issue, the City does not squarely address in its briefs whether paying the IP premiums, either before or after the DOL issued its 2011 Final Rule, was consistent with the fixed-salary requirement.[6] The record, however, indicates the City believed that the IP payments were overtime premiums, which an employer may—indeed must—pay under the FWW method. In its 2011 Final Rule, the DOL stated that "[w]hile the Department continues to believe that the payment of bonus and premium payments can be beneficial for employees in many other contexts, we have concluded that unless such payments are overtime premiums, they

---

6.    The City contends that Plaintiffs, by not specifically explaining why the IP provision violated the fixed-salary requirement, have conceded they had a fixed salary after the standby and holiday premiums were discontinued. The Court disagrees. Although Plaintiffs could have offered more on that particular point, they have insisted throughout this case that the City's pay plan violates all but the first requirement of § 778.114. Given that Plaintiffs do not bear the burden of proof on compliance with § 778.114, the Court declines to hold that Plaintiffs have conceded that point through omission. *Cf. Aiken v. Cty. of Hampton*, 172 F.3d 43 (4th Cir. 1998) (noting plaintiff had stipulated that the clear mutual understanding requirement of § 778.114 was met). The Court notes, however, that the City has likewise failed to explain how the IP provision actually comported with the fixed-salary requirement. At most, the City has argued the provision was permissible under the ultimately unpromulgated proposed changes to § 778.114 in the DOL's 2008 Notice. If failure to elaborate is to be held against anyone, it should be held against the party with the burden of proof.

are incompatible with the fluctuating workweek method of computing overtime under section 778.114." 76 Fed. Reg. at 18850. Responding to that conclusion, Cross wrote in her May 4, 2011 memorandum to Mayor Riley that IP premiums "ha[ve] always been available only as an overtime premium pay." (Def.'s Mem. in Opp. Pls.' Mot. Summ. for J., Ex. A, Cross Mem., ECF No. 159-1, at 3.)

As an initial matter, Cross's statement was not entirely accurate. Before May 2011, a firefighter could be paid an IP premium for working an unscheduled shift even if that shift did not consist entirely of overtime hours. In explaining the IP provision in 2007, the City provided the following example:

> Firefighter Smith has 96 regularly scheduled hours in a [sic] the same particular work period. He volunteers to work an extra unscheduled shift. His normal two-week salary is $1555.00. In addition to his salary, he also will receive $270.00 in incentive pay for the extra shift he volunteered to take. This is added to his salary for a total of $1825.00 in base pay which, for this particular work period, is considered his straight time pay for all hours worked. In this particular work period, he will have worked 120 hours. That means he has a straight time rate of $15.21 this work period. In addition to his straight time, he must also receive an additional half time ($7.61) for all hours over 106. Thus, he will also be paid $106.54 ($7.61 x 14). His total pay for this work period will now be $1931.54.
>
> As you can see, the increase in Smith's earnings for working the single additional shift is more than simply the $270.00 he received as base incentive pay because it also affects overtime pay:
>
> $1931.54 …. (total pay with extra shift)
> minus  $1555.50 …..(amount of pay without extra shift)
> $ 376.54      (Increase in total pay due to additional shift)

(Def.'s Mot. for Partial Summ. J., Ex. A, ECF No. 126-2, at 6.) In that scenario, the firefighter's IP payment was based in part on ten hours of non-overtime work. Thus, IP payments were not always tied only to overtime work. More importantly, insofar as the City paid IP premiums for hours not worked over the 106-hour threshold, that practice was inconsistent with the fixed-salary requirement. *See, e.g.*, *Dooley v. Liberty Mut. Life Ins. Co.*, 369 F. Supp. 2d 81, 86 (D.

Mass. 2005) (holding payment of premium rate for Saturday work when employee had worked fewer than forty hours in a week violated the fixed-salary requirement and thus precluded use of the FWW method).

As for IP premiums paid for work performed beyond the 106-hour threshold, Cross's characterization of those payments as "overtime premiums" does not comport with the DOL's overtime pay regulations. To qualify as an overtime premium, extra compensation for overtime hours must be paid in the form of "a rate per hour." 29 C.F.R. § 778.308(a); *accord* 29 C.F.R. § 778.207(b) ("[E]xtra compensation[,] in order to qualify as an overtime premium[,] must be provided by a premium rate per hour . . . ."). The IP premiums, however, were designed to be paid as lump sums, rather than hourly rates. Moreover, "[a] premium in the form of a lump sum which is paid for work performed during overtime hours *without regard to the number of overtime hours worked* does not qualify as an overtime premium even though the amount of money may be equal to or greater than the sum owed on a per hour basis." 29 C.F.R. § 778.310 (emphasis added). The City not only admits that § 778.310 applied to the IP premiums, but that the premiums were paid without regard to the number of overtime hours worked:

> When partial shifts were worked, the firefighter earned a flat sum equal to half of the normal fee for working a partial shift. It did not matter whether the firefighter worked 12 hours, 15 hours, 17 hours, or some other number of hours of a partial shift. If he worked only a partial shift, he received a flat rate equal to half of the normal IP rate—regardless of the number of hours actually worked.

(Def.'s Mem. in Supp. Mot. for Partial Summ. J., ECF No. 126-1, at 21.)[7] Thus, the regulations demonstrate that the IP premiums were not overtime premiums.[8]

---

7.     Although the City made this statement in its prior motion for partial summary judgment on its affirmative defenses, it incorporated the statement by reference into the summary judgment motion now under consideration. (*See* Def.'s Mem. in Supp. Mot. for Summ. J., ECF No. 156-1, at 9 n.22.)

8.     The City's characterization of the IP premiums as overtime premiums is further undermined by the fact that the City included IP payments in its calculations of firefighters' regular rates of pay in order to determine how much overtime pay firefighters were owed. *See Brantley*, 821 F. Supp. 2d at 889 ("Plaintiffs' premiums were added to

In short, paying an employee an hours-based premium in addition to a fixed salary invalidates the use of the FWW method unless that premium falls within the law's definition of an overtime premium. *See* § 778.114(a); 76 Fed. Reg. at 18850; *cf. Wills*, 981 F. Supp. 2d at 263 (holding the payment of performance-based bonuses does not violate the fixed-salary requirement). The IP premiums did not fall within that definition. Rather, they were hours-based premiums that caused employees to not receive a "fixed amount of straight time pay for all hours in the workweek, whether few or many." 76 Fed. Reg. at 18850. Accordingly, the IP provision did not comply with § 778.114.

### ii. Holiday Premiums

Plaintiffs also argue the holiday pay component of the City's pay plan, which ended in May 2011, violated the fixed-salary requirement of § 778.114. Numerous courts have held that paying employees premiums to work on holidays is incompatible with the fixed-salary requirement. *See, e.g.*, *Brantley*, 821 F. Supp. 2d at 890 (holding employer violated fixed-salary requirement by paying employees extra for working on holidays); *Brumley*, 2010 WL 1644066, at *6 (same); *Adeva*, 2010 WL 97991, at *2 (same). The City, however, contends that until the DOL issued its Final Rule in 2011, the FWW method allowed employers to pay employees extra for working holidays. The City bases its argument on *Aiken v. County of Hampton*, 677 F. Supp. 390 (D.S.C. 1997), *aff'd*, 172 F.3d 43 (4th Cir. 1998) (unpublished). *Aiken*, however, is distinguishable. As the court in *Brantley* explained,

> In *Aiken* . . . , the court found that the employer met the requirements for applying the FWW and stated that holiday pay was a "fringe benefit" rather than part of an employee's salary. However, the holiday pay in *Aiken* differed from the holiday premiums at issue here. The plaintiff in *Aiken* "would have been entitled to the 16 hours holiday pay whether or not he had worked on the two holidays," whereas

their non-overtime compensation for each week. Thus, . . . the instant premiums caused non-overtime compensation to vary from week to week.").

the instant Plaintiffs were paid holiday premiums only if they actually worked on holidays.

*Brantley*, 821 F. Supp. 2d at 889 (internal citations omitted); *see also Brumley*, 2010 WL 1644066, at *6 (distinguishing *Aiken* on the same basis). The same is true here. Firefighters could obtain the additional 9.6 hours of pay only by actually working on a holiday. Thus, the City's holiday premiums ran afoul of the fixed-salary requirement.

       iii.    *Standby Premiums*

Plaintiffs next argue the standby pay component of the City's pay plan, which also ended in May 2011, violated the fixed-salary requirement. As discussed above, paying employees extra to work during scheduled time off is antithetical to the concept of a fixed salary. *Cf., e.g.*, *Brantley*, 821 F. Supp. 2d at 890 (holding employer violated fixed-salary requirement by paying employees extra for working on scheduled days off); *Brumley*, 2010 WL 1644066, at *6–7 (same); *Adeva*, 2010 WL 97991, at *2 (same); *Ayers*, 2007 WL 646326, at *10 (same). Thus, the Court holds that the standby premiums were inconsistent with the fixed-salary requirement.

The City claims the DOL's 2008 Notice demonstrates that, until April 2011, paying standby was consistent with the FWW method. However, as this Court explained in its Prior Order, the 2008 Notice was only a proposal to change § 778.114; it was not an explanation of what § 778.114 already allowed. Thus, the City's argument must be rejected.

       iv.    *Overtime Pay for Special Teams Work*

The fifth requirement of § 778.114 is that employees receive "a fifty percent overtime premium in addition to the fixed weekly salary for *all* hours that the employee works in excess" of the statutory maximum workweek. *Griffin*, 142 F.3d at 715 (quoting *Flood*, 125 F.3d at 252) (emphasis added). Plaintiffs contend the City failed to pay firefighters overtime premiums for all overtime hours spent training for special teams. The record demonstrates that the City failed to

28

pay plaintiff Michael Pack $37.59 in overtime for one training period on December 17, 2010. However, Plaintiffs have not shown a genuine issue of material fact as to whether the City failed to pay any other plaintiff all overtime premiums due for work related to special teams. Accordingly, Plaintiffs have established a violation of § 778.114's all-hours requirement, but only as to Plaintiff Pack.  With the exception of Plaintiff Pack's one claim discussed above, the Court grants the City summary judgment on this issue.

       *v.*    *Overtime Pay for Firefighter Recruits*

Finally, Plaintiffs argue the City violated § 778.114's all-hours requirement by failing to pay recruits all overtime premiums owed at the time they were due.  As the City admits, by erroneously applying the 53-hour workweek to uncertified recruits from 2009 to 2011, the City did not timely pay those recruits all the overtime premiums they were owed.  After the City discovered its error, it paid each affected recruit his or her owed half-time overtime premiums, plus liquidated damages.

The parties dispute whether the City, when it repaid the recruits, was allowed to use the FWW method's half-time rate or instead had to use the time-and-a-half multiplier to calculate the amount of back pay owed.  That dispute, however, addresses the measure of damages for a FLSA violation.  The relevant, prerequisite question is whether that failure to pay created liability under the FLSA.  Although the parties do not adequately address that question, the Court has little difficulty concluding that failing to pay non-exempt employees overtime premiums when due (whether at half-time or time-and-a half) violates the FLSA.

\* \* \*

In sum, the City's IP, holiday, and standby premiums were each incompatible with the FWW method's fixed-salary requirement.  As to those particular issues, the Court grants

Plaintiffs' motion and denies the City's motion.  As for training pay, with regard to Plaintiff Pack's 2010 claim, the Court grants Plaintiff's motion and denies the City's motion.  On all other aspects of the training pay issue, the Court grants the City's motion and denies Plaintiff's motion.  Finally, the Court grants Plaintiff's motion as to the issue of recruit pay.[9]  The Court need not address the parties' remaining arguments on whether the City complied with § 778.114.  *See, e.g.*, *Brumley*, 2010 WL 1644066, at *6 (granting plaintiff summary judgment on liability after finding defendant violated the fixed-salary requirement, and declining to reach parties' remaining arguments on the FWW method (citation omitted)).

### B.  *The Statute of Limitations*

"The FLSA provides two potential limitations periods."  *Desmond*, 630 F.3d at 357.  For non-willful FLSA violations, a two-year period applies.  *Id.*  When the violation is willful, the period is three years.  *Id.*  The two-year period applies unless the employees prove willfulness.  *See id.* at 358 (citing 29 U.S.C. § 255(a)); *see also Cubias v. Casa Furniture & Bedding, LLC*, No. 1:06CV386 (JCC), 2007 WL 150973, at *3 (E.D. Va. Jan. 16, 2007) ("The FLSA is typically governed by a two-year statute of limitations, but provides for a three year statutory period if the Plaintiff can establish that the violation was willful." (citing 28 U.S.C. § 255(a)).

In the context of the FLSA's statute of limitations, willfulness means the employer "either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the [FLSA]."  *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988).  "'[W]illful' is considered synonymous with 'deliberate' and 'intentional.'"  *Butler v. DirectSAT USA, LLC*, 55 F. Supp. 3d 793, 802 (D. Md. 2014) (quoting *McLaughlin*, 486 U.S. at 133).  "Negligent conduct

---

9.   The City did not move for summary judgment on this issue.

is insufficient to show willfulness." *Desmond*, 630 F.3d at 538 (citing *McLaughlin*, 486 U.S. at

135).

In its prior motion for partial summary judgment, the City asked the Court to rule that

Plaintiffs have failed to establish willfulness and thus the two-year limitations period applies to

this case.  The Court declined to reach that issue in its Prior Order; because the City's

compliance with the FLSA was still an open question, deciding whether the City's potential

violations were willful would be premature.  However, the Court added,

> While it remains to be seen whether the City in fact complied with the FLSA, the
> Court nevertheless notes that despite bearing the burden of proof with regard to
> willfulness, *Desmond*, 630 F.3d at 358, Plaintiffs have put forward little more
> than vague allegations and conclusory assertions in support of a three-year statute
> of limitations.  Again, although the Court need not reach this issue absent a
> determination of liability, *see id.*, the current record is noticeably devoid of any
> evidence suggesting that the City willfully violated the FLSA.  Quite to the
> contrary, the evidence reveals what appears to have been a diligent effort by the
> City to craft a creative solution in the aftermath of a tragedy and in response to an
> unfortunate and unanticipated set of circumstances within the Department.

Prior Order at 26 n.10.

In its present summary judgment motion, the City continues to assert that the two-year

limitations period applies.  After carefully reviewing briefs and the record in light of the City's

renewed request, the Court has found nothing that changes its prior conclusion.  In addition to

reflecting diligence and creativity, the record shows that the City attempted on several occasions

to ensure that its pay plan complied with the FLSA.   For example, Cross testified that when she

and other City officials designed the IP provision in 2007, they relied on several sections of Part

778 and consulted an attorney who specializes in employment compensation law.  When the

DOL issued its 2008 Notice, Cross analyzed it to determine whether the City's pay plan

complied with the FWW method.  Likewise, when the DOL issued its 2011 Final Rule, Cross

scrutinized it and promptly realized that it required the City to change its practices regarding IP,

holiday, and standby premiums. The fact that the City's understanding about the FWW method turned out to be incorrect in some respects does not amount to willfulness. *See McLaughlin*, 486 U.S. at 135 (rejecting proposed standard of willfulness that would have included "a completely good-faith but incorrect assumption that a pay plan complied with the FLSA").

As to the recruit overtime pay issue, when the City discovered its error, it voluntarily reported the error to the DOL, apologized to affected firefighters, paid them twice the amount of the withheld overtime premiums, and amended its overtime calculation practices for recruit pay. Such forthcoming conduct undercuts the suggestion that the City acted willfully. *Cf. Hurd v. NDL, Inc.*, No. CIV. CCB-11-1944, 2012 WL 642425, at *6 (D. Md. Feb. 27, 2012) (stating "evidence of a scheme by the employer to cover-up FLSA violations" could support a finding of willfulness (citation and quotation marks omitted)). Rather, the record indicates that the City's failure to update its payment methodology in 2009 was, at worst, a negligent oversight. Even if a jury were to find that oversight negligent, that would not rise to the level of willfulness. *See Desmond*, 630 F.3d at 538.

Finally, as for the City not paying Plaintiff Pack all overtime due for one day of training, Plaintiff has not produced any evidence that suggests the City's failure was anything more than an isolated episode of inadvertence or miscalculation. *See Wertheim v. Arizona*, No. CIV. 92-453 PHX RCB, 1993 WL 603552, at *4 (D. Ariz. Sept. 30, 1993) ("The FLSA statute of limitations is two years for an inadvertent violation . . . .").

To be sure, willfulness is, conceptually, a question of fact. However, Plaintiffs have not established a genuine dispute as to that factual issue. *See Linnville v. RW Props.*, No. 6:13-CV-542-BHH, 2015 WL 196372, at *5 (D.S.C. Jan. 15, 2015) ("While the 'willfulness' of a violation is 'ultimately a question of fact, a plaintiff must present sufficient evidence of willfulness to

survive summary judgment.'" (quoting *Hantz v. Prospect Mortg., LLC*, 11 F. Supp. 3d 612, 617

(E.D. Va. Feb. 5, 2014))). Therefore, the FLSA's two-year limitations period applies to all

claims asserted in this case. Accordingly, the Court grants the City's motion as to the statute of

limitations issue. All claims that accrued before November 7, 2011, are dismissed.

### E.  *Liquidated Damages*

Finally, the City renews its argument that a liquidated damages award would be

unwarranted. "The FLSA provides for mandatory liquidated damages in an amount equal to the

unpaid overtime compensation." *Perez v. Mountaire Farms, Inc.*, 650 F.3d 350, 375 (4th Cir.

2011) (citing 29 U.S.C. § 216(b)). "[H]owever, a district court, in its sound discretion, may

refuse to award liquidated damages if 'the employer shows to the satisfaction of the court that the

act or omission giving rise to such action was in good faith and that he had reasonable grounds

for believing that his act or omission was not a violation of the [FLSA].'" *Id.* (quoting 29 U.S.C.

§ 260). "The employer bears the burden of proof in establishing this defense." *Id.* (citing

*Donovan v. Bel–Loc Diner, Inc.*, 780 F.2d 1113, 1118 (4th Cir. 1985)). Although Congress's use

of "and" in § 260 suggests that an employer must establish both reasonableness and good faith,

the Fourth Circuit has held proof of either reasonableness or good faith to be sufficient. *See id.*at

375–76 (affirming district court's denial of liquidated damages because evidence supported

district court's finding of good faith); *Mayhew v. Wells*, 125 F.3d 216, 220 (4th Cir. 1997)

("[W]e have previously found no abuse of discretion when the court below was convinced only

of one prong"); *Brinkley–Obu v. Hughes Training, Inc.*, 36 F.3d 336, 357–58 (4th Cir. 1994)

(finding no abuse of discretion where district court was satisfied as to the employer's good faith).

The good-faith prong requires proof of objective, not subjective, good faith. *Clifton D.*

*Mayhew, Inc. v. Wirtz*, 413 F.2d 658, 661–62 (4th Cir. 1969). The record is replete with

evidence that the City acted in objective good faith toward Plaintiffs. First, as discussed above, none of the City's conduct could be construed as willful. *See Perez*, 650 F.3d at 375 (crediting district court's finding that employer's acts were not willful as evidence of employer's good faith); *Roy*, 141 F.3d at 548 (same). Second, and to the contrary, the City consulted DOL publications to stay abreast of the law regarding the FWW method, and when the City identified a change or an error, it reacted promptly. *See Martinez-Hernandez v. Butterball, LLC*, No. 5:07-CV-174-H 2, 2011 WL 4591073, at *3 (E.D.N.C. Sept. 30, 2011) (stating § 260 "requires the employer to prove an honest intention to ascertain and follow the law" (citing *Hultgren v. Cty. of Lancaster*, 913 F.2d 498, 509 (8th Cir. 1990))); *see also Roy*, 141 F.3d at 548 (finding employer's "ongoing modification of its compensation structure to accommodate changes" in the FLSA was evidence of good faith); *Burnley v. Short*, 730 F.2d 136, 140 (4th Cir. 1984) (upholding finding of good faith where there was evidence that employer relied on newsletters to keep informed of FLSA coverage). Third, the City involved an employment attorney in its development of the IP provision and in its voluntary reporting of the recruit overtime premium violation. *See Roy*, 141 F.3d at 148 (finding employer's consultation with counsel was evidence the employer acted in objective good faith). Fourth, although the IP, holiday, and standby premiums ran afoul of the FWW method, the record demonstrates that the City made those payments in an effort to reward firefighters for working in unideal circumstances. *See Rau v. Darling's Drug Store, Inc.*, 388 F. Supp. 877, 887 (W.D. Pa. 1975) ("[T]he bonuses that were paid, although not found by this Court to be credits toward overtime, are, nevertheless, further evidence of the good will that was present during most of the period in question. Of course, the existence of good will does not necessarily comport with good faith compliance with the Fair Labor Standards Act, but, taken in consideration with all the evidence in the case, the Court is

satisfied that Darling's desired Rau to receive adequate compensation for her very valuable services and devotion to the store.").

Plaintiffs contend that § 260 requires the City to establish that it took affirmative steps to ensure that its pay plan complied with the FLSA, and that the City has not produced evidence of such actions.  *See Lockwood v. Prince George's Cty.*, 217 F.3d 839, at *6 (4th Cir. 2000) (per curiam) (table) ("[G]ood faith 'requires that an employer first take active steps to ascertain the dictates of the FLSA and then move to comply with them.'" (quoting *Reich v. S. New England Telecomm. Corp.*, 121 F.3d 58, 71 (2d Cir. 1997))).  As discussed above, the record demonstrates that the City analyzed DOL publications in an attempt to determine whether the IP, holiday, and standby premiums complied with the law.  Further, when the City discovered its error regarding recruit pay, it engaged an attorney to report the violation to the DOL and to develop a remedy for affected recruits.

In sum, the City has met its burden, under § 260, of showing "that it would be unfair to impose . . . more than a compensatory verdict."  *Burnley*, 730 F.3d at 140.  The City shall not have to pay any liquidated damages on any of Plaintiffs' remaining claims.

## CONCLUSION

For the foregoing reasons, it is **ORDERED** that Plaintiffs' Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART.**  It is **FURTHER ORDERED** that the City's Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**.

     **AND IT IS SO ORDERED.**

PATRICK MICHAEL DUFFY
United States District Judge

**November 3, 2015**
**Charleston, South Carolina**